PATRICIA ANN BLACKMON, J.:
{¶1} William Sheil ("Sheil") of WJW-TV, requestor-appellant/cross-appellee, appeals the May 16, 2018 final order and entry of the Court of Claims of Ohio that did not adopt the special master's report and recommendation of April 16, 2018, that ordered the public records access to Tri-C Foundation's contract with actress Octavia Spencer ("Spencer").
{¶2} Respondents-appellee/cross-appellant, John Horton ("Horton"), Cuyahoga Community College ("Tri-C") Media Relations Manager, cross-appeals, challenging the final order of the Court of Claims of Ohio in regards to its determination that the Spencer contract at issue is not a trade secret.
{¶3} The assigned errors in the appeal are as follows:
I. The Court of Claims erred by denying a public records request when three of the four factors under State ex rel. Oriana House, Inc. v. Montgomery weighed in favor of a finding that [the Tri-C] Foundation was the functional equivalent of a public office and thus subject to the Public Records Act.
II. The Court of Claims erred by concluding that [the Tri-C] Foundation was not responsible for public records of [Tri-C].
The assigned error in the cross-appeal states:
The Court of Claims misapplied the law by concluding that the [Tri-C] Foundation's contract with Ms. Spencer is not protected from disclosure under the Public Records Act as a trade secret based on the public availability of a different contract with a different entity.
{¶4} Having reviewed the record and pertinent law, we hold as a matter of law that this court has jurisdiction over this matter pursuant to R.C. 2743.75(G)(1). We find that the Court of Claims of Ohio erred in not adopting the report and recommendation of the special master as it relates to *198 the unredacted Spencer contract; consequently, we reverse its decision as to the fifth and seventh objections. We conclude that the Tri-C Foundation is the functional equivalent of a public office under R.C. 149.011(A), and as such, is subject to the Public Records Act, R.C. 149.43. We further conclude that the Spencer contract is not a trade secret; therefore, under the public records law, Sheil is entitled to the unredacted Spencer contract.
{¶5} This action is based on the public records request of Sheil to have an unredacted copy of the contract between Spencer and the Tri-C Foundation as to its fundraising luncheon where Spencer appeared as the keynote speaker.
{¶6} The issues for us in this appeal are whether Tri-C's Foundation meets the functional equivalence test as a public entity under Oriana House, Inc. v. Montgomery , 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, thus subjecting it to the, R.C. 149.43, and whether the Spencer contract is a trade secret and thus not subject to disclosure.
{¶7} Established in 1973 by Tri-C's then-Vice President of Finance, Dante Biello, the Tri-C Foundation was incorporated with the following purposes:
1. To receive, hold, invest and administer property of any kind, including money, * * * for the benefit of, any community college now or hereafter owned or operated by the Board of Trustees of the Cuyahoga Community College District * * * [including to] make expenditures for any one or more of the normally accepted functions of colleges and universities;
2. To acquire, construct, equip, furnish, repair, remodel, renovate, enlarge, improve, maintain and operate buildings, structures, and facilities, and to acquire real estate and interests in real estate in connection therewith, or any combination thereof, for the use of such Community College, its staff, faculty, students, or any organization thereof or related or affiliated thereto;
3. To establish and maintain programs for the purpose of financially assisting, directly or indirectly, by gift, loan, guaranty, or otherwise students attending [Tri-C] * * *;
4. To engage in and conduct special activities on behalf of [Tri-C], its staff, faculty, students, or any organization thereof or related or affiliated thereto;
5. To engage in and conduct activities and programs for solicitation of contributions from the general public for the benefits, directly or indirectly, of said corporation or [Tri-C].
{¶8} In the event of dissolution of the Tri-C Foundation, its assets are to be transferred to the Board of Trustees of the Cuyahoga Community College District.
{¶9} According to Megan O'Bryan, the president of the Tri-C Foundation, ex officio member of the Tri-C Foundation Board, and vice-president of development for Tri-C, the Tri-C Foundation was incorporated "for the purpose of collecting donations from individuals, corporations, and foundations * * * to be distributed as scholarships to persons attending [Tri-C] and to be used for other purposes benefitting [Tri-C]." O'Bryan explained:
9. The [Tri-C] Foundation transfers funds to [Tri-C] for distribution as scholarships to students, for educational program enhancement, or for emergency funds for students in financial distress. The acceptance of these funds are approved by the College Board of Trustees.
{¶10} O'Bryan also averred that the Tri-C Foundation's scholarship luncheon featuring Spencer raised $1,200,000. In 2017, the Tri-C Foundation raised $2,900,000 for *199 Tri-C scholarships, and since 1992, the luncheons have raised in excess of $18,000,000.
{¶11} O'Bryan stated that the Tri-C Foundation has a board of approximately sixty directors, four of whom are ex officio seats held by Tri-C officers or employees. Tri-C provides the Tri-C Foundation with office space and technology in-kind support, the value of which is determined by Tri-C's chief financial officer. However, the Tri-C Foundation manages its own endowment money and does not hold funds in Tri-C's name.
{¶12} According to the Tri-C Foundation's Comprehensive Annual Financial Report for 2016, the Tri-C Foundation received contributions and special events revenue from Tri-C of $870,874. The following year, the Tri-C Foundation received $1,158,452. The Tri-C Foundation also receives and holds grant monies from various donors that it submits to Tri-C for education development programs once the conditions of the grants are met.
{¶13} The Tri-C Foundation is subject to annual audits by the Ohio auditor of state pursuant to R.C. Chapter 117, and state auditing rules require the Tri-C Foundation to identify itself as a "unit" of Tri-C. The Tri-C Foundation's Independent Auditor's Reports for 2016 and 2017 identify the Tri-C Foundation as "a component unit of [Tri-C.]" The Tri-C Foundation's Independent Auditor's reports are available online on the Ohio auditor's official website.
{¶14} The Tri-C Foundation is a tax-exempt corporation under Section 501(c)(3). Its IRS form 990 forms demonstrate that the Tri-C Foundation gives grants of over $1,000,000 per year to Tri-C, and that the Tri-C Foundation's books and records are kept by Tri-C's accounting and financial operations director. In 2013, the Tri-C Foundation's 2013 IRS Form 990 described the Foundation's tax-exempt activities as follows:
The Tri-C Foundation conducts its activities within the College's Office of Resource Development. Tri-C Foundation is responsible for fund-raising and "friend raising" opportunities and activities College-wide working with partners from foundations/organizations, corporations/businesses, individuals, and government agencies. Solicitations are presented on behalf of [Tri-C] or the Foundation as appropriate to the funding source. All fund-raising activities conducted by [the] Foundation are evaluated and determined to benefit [Tri-C] and its students.
{¶15} The Tri-C Foundation entered into an agreement with Spencer outlining her appearance as the keynote speaker at an October 4, 2017 fund-raising luncheon. Several weeks before the luncheon, Sheil, on behalf of WJW-TV, sought a copy of the agreement from Horton. Horton refused to provide the agreement, and asserted that the Tri-C Foundation is "not the equivalent of a public entity and not subject to the Ohio Public Records Act." Sheil subsequently filed a public records request in the Court of Claims seeking a copy of the agreement.
{¶16} A special master for the Court of Claims determined that the Tri-C Foundation is the functional equivalent of a public office and therefore subject to the Public Records Act in accordance with the test articulated in State ex rel. Oriana House, Inc. v. Montgomery , 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193. The special master also concluded that the Spencer contract does not constitute a trade secret. See Sheil v. Horton , Ct. of Cl. No. 2017-00772-PQ, 2018-Ohio-1720 (special master's decision hereafter referred to as "Sheil I"). Horton filed objections to the special master's report. On May 16, 2018, a *200 Court of Claims judge found two of Horton's objections well taken. See Sheil v. Horton , Ct. of Cl. No. 2017-00772-PQ, 2018-Ohio-2355 (court of claims judge's decision hereafter referred to as "Sheil II"). The judge refused to adopt the special master's recommendation that the Tri-C Foundation is the functional equivalent of a public office, but agreed that the Spencer contract was not a trade secret. Both parties appeal.
Sheil's Appeal
I. Functional Equivalent of a Public Office
{¶17} In the first assigned error, Sheil argues that the Tri-C Foundation is the functional equivalent of a public entity. In opposition, Horton and the Tri-C Foundation maintain that the functional equivalence test has not been met.
{¶18} Private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office. Oriana House, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at paragraph one of the syllabus. The functional-equivalency analysis begins with the presumption that private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office. Id. at ¶ 16. Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." State ex rel. Am. Ctr. for Economic Equality v. Jackson, 2015-Ohio-4981, 53 N.E.3d 788, ¶ 10 (8th Dist.), quoting Cross v. Ledford , 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.
{¶19} The Oriana House court set forth the following analysis for determining when a private entity is the functional equivalent of public office:
[T]he court must analyze all pertinent factors, including (1) whether the entity performs a governmental function, (2) the level of government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government or to avoid the requirements of the Public Records Act.
Id. at paragraph two of the syllabus. The test is applied on a case-by-case basis, "examining all pertinent factors with no single factor being dispositive." Id . at ¶ 23. However, the court acknowledged that R.C. 149.43 should be liberally construed, with any doubt to be resolved in favor of disclosure. Id . at ¶ 15.
{¶20} The applicable standard of review in appeals brought pursuant to R.C. 2743.75 was described in Hurt v. Liberty Twp ., 5th Dist. Delaware, 2017-Ohio-7820, 97 N.E.3d 1153, as follows:
Application of statutory language, to determine whether specific information is confidential and privileged, is a question of law that we must review de novo. * * * However, insofar as factual issues must be determined by the trial court as a predicate to resolving the legal question of privilege, such factual determinations should be accorded deference.
Id. at ¶ 33.
1. Governmental Function
{¶21} For this portion of the test, the function performed by the entity is considered in order to determine whether this function is a "historically government *201 function" or has traditionally been performed by private entities. See State ex rel. Bell v. Brooks , 130 Ohio St.3d 87, 2011-Ohio-4897, 955 N.E.2d 987, ¶ 22.
{¶22} Sheil emphasizes that the Tri-C Foundation was created by Tri-C's then-vice president, and that the funds raised by the Tri-C Foundation are distributed by Tri-C. He maintains that the Tri-C Foundation promotes the receipt and solicitation of gifts to an institution of higher learning, a matter that has "evolved to become a governmental function." In opposition, the Tri-C Foundation asserts that its role, raising scholarship money for students, is neither traditionally, exclusively, nor uniquely a government function. Rather, the Tri-C Foundation acts in a manner analogous to a private consulting company.
{¶23} Here, the special master concluded:
"The receipt and solicitation of gifts * * * is an indispensable function of any institution of higher learning." State ex rel. Toledo Blade Co. v. Univ. of Toledo Found. , 65 Ohio St.3d 258, 262, 602 N.E.2d 1159 (1992).
Tri-C Foundation solicits and receives public donations, to be distributed as scholarships to persons attending Tri-C and for other purposes benefitting Tri-C. * * *(O'Brien [sic] Aff. I at ¶ 5; Court's Exh. at 41.) The Tri-C Foundation thus performs an indispensable sub-function within Tri-C's traditional governmental education function. This factor weighs strongly in favor of Tri-C Foundation's status as the functional equivalent of a public office.
Sheil I, 2018-Ohio-1720 at ¶ 7. The judge noted that modern college financial assistance now involves "full federal oversight and financing of a massive and complex system of financial aid," and that pursuant to R.C. 3358.09, the General Assembly permits a state community college to obtain support from "other sources." Sheil II, 2018-Ohio-2355 at ¶ 31. Therefore, the judge concluded that "there is some support for the proposition that the receipt and solicitation of gifts in connection with an Ohio entity of higher education has evolved to become a governmental function." Id.
{¶24} In Toledo Found. , the Ohio Supreme Court held that "the solicitation and receipt of donations for the [University of Toledo], and keeping records of that activity, are government functions." Toledo Found. , 65 Ohio St.3d at 262, 602 N.E.2d 1159. In addition, the court considered the purpose of the Tri-C Found. as described in its articles of incorporation, i.e., "receive, hold, invest and administer property and to spend funds for the benefit of the university." The court also considered whether the Tri-C Foundation paid rent to the university, salaries to its staff, and holds funds for the university.
{¶25} Toledo Found. was mentioned in Oriana House , and was not overruled. Moreover, in 2016, the Ohio attorney general considered whether a private nonprofit corporation, "the primary purpose of which is to act as a major gift-receiving and soliciting arm of the public college or university, the assets of which inure to the benefit of and are primarily expended for the public college or university, and which is responsible for keeping records of donations for the public college or university," is subject to audit by the auditor of state pursuant to R.C. 117.10(A). The attorney general opined as follows:
A public college or university foundation, the primary purpose of which is to solicit and receive, on behalf of a state college or university, gifts, donations, and bequests made for the benefit or use of the state college or university, and which is responsible for keeping records *202 of donations for the state college or university is an entity established for the exercise of a function of government.
2016 Ohio Atty.Gen.Ops. No. 2016-013.
{¶26} Here, as noted by the special master,
The Tri-C Foundation articles of incorporation also include the purpose to receive, hold, invest and administer funds for Tri-C. Unlike the UT Foundation, Tri-C Foundation does not pay rent for office space in Tri-C property, or pay for Tri-C staff time, office services, or office equipment, which is accounted for only by an internal charge-back.
Sheil I, ¶ 28. The Tri-C Foundation is also subject to annual audits by the Ohio auditor of state pursuant to R.C. Chapter 117, and state auditing rules require the Tri-C Foundation to identify itself as a "unit" of Tri-C. Accordingly, we conclude that this factor weighs in favor of the Tri-C Foundation's status as the functional equivalent of a public office.
2. Level of Governmental Funding
{¶27} "The Public Records Act was not designed to allow public scrutiny of all entities that receive funds that at one time were controlled by the government" and the "fact that a private entity receives government funds does not convert the entity into a public office for purposes of the Public Records Act." Oriana House, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶¶ 29, 36. However, as noted in Brooks ,
From the audit report of CORSA submitted by Bell into evidence, over 88 percent of its income for the fiscal year ending April 30, 2008, consisted of member contributions. * * * This level of government funding is significant. See Oriana House at ¶ 32 (entity's receipt of 88 percent of its total revenues from public sources found to be a significant level of government funding); State ex rel. Repository v. Nova Behavioral Health, Inc ., 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, ¶ 32-33 (entity's receipt of nearly 92 percent of mental-health-services revenue from public sources deemed to be a significant level of government funding).
Id . at ¶ 23.
{¶28} In support of the second factor, Sheil notes that Tri-C receives almost all of the revenue collected by the Tri-C Foundation, and a portion of its operational expenses come from Tri-C. In opposition, the Tri-C Foundation maintains that it receives only approximately three percent of its total funding from Tri-C.
{¶29} The special master found that "most or all of Tri-C Foundation's operating expenses are funded by a combination of direct government contributions from Tri-C, and a portion of the public moneys it has collected." Sheil I, 2018-Ohio-1720 at ¶ 11. He concluded that this factor to "weighs moderately to strongly" in favor of the Tri-C Foundation as being the functional equivalent of a public office. Id . The special master also found it significant that the Tri-C Foundation receives funds "[a]s a purported representative or agent of [a] public office," within the definition of R.C. Chapter 117. Id. at ¶ 10. The court of claims judge also concluded that this factor "weighs moderately to strongly in favor of the [Tri-C] Foundation's status as the functional equivalent of a public office." Sheil II, 2018-Ohio-2355 at ¶ 37.
{¶30} This court agrees with the special master's analysis and we likewise conclude that this factor weighs in favor of the Tri-C Foundation's status as the functional equivalent of a public office.
3. Extent of Government Involvement or Regulation
{¶31} This Oriana House factor is "the extent of government involvement or *203 regulation." (Emphasis added.) Sheil II, 2018-Ohio-2355 at ¶ 40, quoting Oriana House, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, ¶ 25.
{¶32} Sheil argues that although Tri-C does not control the day-to-day operations of the Tri-C Foundation, the two entities are closely intertwined in light of the ex officio Board members, in kind contributions from Tri-C, the Ohio state auditor filing requirements, and the IRS form 990 statements, and other financial disclosure documents. In opposition, Horton and the Tri-C Foundation asserted that the court's primary focus should be upon Tri-C's lack of involvement in the day-to-day operations of the Tri-C Foundation, and using this standard, this Oriana House factor is not met.
{¶33} The special master concluded that the two entities are "closely intertwined." Sheil I, 2018-Ohio-1720 at ¶ 12. The special master stated:
Tri-C Foundation is co-located with Tri-C in Tri-C facilities, where it is administratively involved with Tri-C by using contributed Tri-C staff time, technological services, office services, and office equipment. (O'Bryan Aff. I at ¶ 25-32.) Tri-C Foundation is listed on the Tri-C web site as a Tri-C Administrative Department. In Tri-C's Organizational Chart, Tri-C Foundation and the Vice President of Development compose a unit directly under the President of the College. (Court's Exh. at 226.) Tri-C Foundation uses Tri-C email addresses through Tri-C servers. The Tri-C Foundation web presence is entirely on the Tri-C web site. Tri-C Foundation apparently has no paid employees of its own. (Court's Exh. at 85; O'Bryan Aff. I at ¶ 30-32; O'Bryan Aff. II at ¶ 10.)
Tri-C Foundation is so fiscally intertwined with Tri-C that it must be reported as "a component unit of" Tri-C in its audit filings. * * *
Id . at ¶ 12-13.
{¶34} The judge agreed that "[even the ]evidence supplied by Horton supports the special master's view that Tri-C and Tri-C Foundation 'are closely intertwined.' " Sheil II at ¶ 39.
{¶35} We concur with these conclusions. This Oriana House factor is "the extent of government involvement or regulation." (Emphasis added.) Sheil II, 2018-Ohio-2355 at ¶ 40, quoting Oriana House, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, ¶ 25. Therefore, Tri-C's lack of control over the Tri-C Foundation's day-to-day operations is not dispositive, given the extent of regulation herein. Additionally, the overwhelming evidence demonstrates that this functional equivalence factor has been met.
4. Creation of Entity
{¶36} The fourth Oriana House factor considers whether the entity was created by the government or to avoid the requirements of the Public Records Act, we consider the purpose for which the entity was created. Oriana House , 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, paragraph two of the syllabus. See also State ex rel. Repository v. Nova Behavioral Health, Inc ., 112 Ohio St. 3d 338, 2006-Ohio-6713, 859 N.E.2d 936, at ¶ 37.
{¶37} The special master concluded, and the parties appear to agree, that there is no evidence that the Foundation was created to avoid the requirements of the Ohio Public Records law. However, as noted by the special master, the "broad purpose of the [Tri-C] Foundation was to serve Tri-C," so "this factor weighs strongly in favor of [the Tri-C Foundation's] status as the functional equivalent of a public office." Sheil I, 2018-Ohio-1720 at ¶¶ 17, 19. In addition, he concluded that "[i]n August *204 1973, Tri-C's then-Vice President of Finance, Dante Biello, incorporated the Tri-C Foundation. Biello also signed as the agent for statutory service, giving as the service address, Cuyahoga Community College District, 2214 East 14th Street." Id. at ¶ 17. The judge reached the opposite conclusion, due to the absence of evidence of avoidance of public records requirements. Sheil II, 2018-Ohio-2355 at ¶ 44.
{¶38} While we agree that there is no evidence that the Tri-C Foundation was created in order to avoid the requirements of the public records law, we note that the judge's determination of this issue ignored the disjunctive aspect of this element of the test, and evidence pertaining to the Tri-C Foundation's incorporation. The record establishes that this factor was met herein.
5. Weighing of Factors
{¶39} Oriana House instructs that courts are to apply a "case-by-case analysis, examining all pertinent factors with no single factor being dispositive" in order to determine whether there is clear and convincing evidence that private entity is the functional equivalent of a public office. Id. , 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, paragraph one of the syllabus.
{¶40} In this matter, Sheil asserts that the judge erred in refusing to conclude that the Tri-C Foundation is a public office, because the court determined only that the fourth Oriana House factor remained unproven, and additional factors from the state auditor's report, tax filings, and financial statements support a finding of functional equivalence. In opposition, Horton asserts that the Tri-C Foundation simply raises money for scholarships and student programs, does not comingle any funds with Tri-C, and is not an alter ego of Tri-C. In short, Horton argues that raising funds is not a governmental function.
{¶41} The special master concluded that the four primary Oriana House factors, coupled with the fact that the Tri-C Foundation is treated as a public entity by the Ohio auditor, together with the decision in Toledo Found. , all weigh in favor of concluding that the functional equivalent test is met. Sheil I, 2018-Ohio-1720 at ¶ 20. The judge concluded that the clear and convincing standard was not satisfied because "not all four [ Oriana House] factors have been satisfied in this instance." Sheil II, 2018-Ohio-2355 at ¶ 46. However, this court has determined that all of the Oriana House factors were established in this matter. Moreover, after examining all pertinent factors, including the Ohio Auditor's filing requirements for the Tri-C Foundation, and the numerous financial documents, we conclude that the evidence clearly and convincingly demonstrates that the Tri-C Foundation operates as the functional equivalent of a public entity.
{¶42} Sheil's first assigned error is well taken.
II. Is Tri-C Foundation Responsible for Public Records of Tri-C?
{¶43} In his second assigned error, Sheil argues that the judge erred in concluding that the Tri-C Foundation is not responsible for Tri-C's public records.
{¶44} Under R.C. 149.43(B) and (C), public records may be obtained from a public office or "the person responsible for the public record" to compel compliance with the Public Records Act. Ohio courts have held that a private entity may be "a person responsible for public records" regardless of whether that entity is acting as the public office's agent, even if the entity is not a "public office." State ex rel. Toledo Blade Co. v. Ohio Bur. of Workers' Comp ., 106 Ohio St.3d 113, 2005-Ohio-3549, 832 N.E.2d 711, ¶ 20. The court considers whether : (1) the private entity prepares records in order to carry out a public *205 office's responsibilities; (2) the public office is able to monitor the private entity's performance; and (3) the public office has access to the records for this purpose. State ex rel. Carr v. Akron , 112 Ohio St.3d 351, 2006-Ohio-6714, 859 N.E.2d 948, ¶ 36, citing State ex rel. Mazzaro v. Ferguson , 49 Ohio St.3d 37, 39, 550 N.E.2d 464 (1990)
{¶45} In this matter, the record contains support for all three of the Mazzaro factors. Although Tri-C does not control the Tri-C Foundation's day-to-day operations or property and the Tri-C Foundation's fundraising database is on a separate server, the Tri-C Foundation prepares records in order to carry out a public office's responsibilities. Tri-C is able to monitor the Tri-C Foundation's performance through the ex officio board members, as well as the various accounting requirements linking the Tri-C Foundation and Tri-C. According to its Form 990 filings, Tri-C Foundation financial records are kept by Tri-C's executive director, accounting and financial operations, who is not a director or officer of Tri-C Foundation. Additionally, the various financial reporting requirements give Tri-C access to the Tri-C Foundation's financial records.
{¶46} In any event, because we have concluded that the Tri-C Foundation is the functional equivalent of a public entity, and O'Bryan possessed the agreement, this assigned error is moot. App.R. 12. See Hicks v. Newtown , Ct. of Cl. No. 2017-00612PQ, 2017-Ohio-8952, ¶ 23.
Horton's Cross-Appeal
{¶47} In his cross-appeal, Horton argues that the special master and the judge erred by concluding that the Tri-C Foundation's Spencer contract is not protected from disclosure under the Public Records Act as a trade secret. He emphasizes that the Tri-C Foundation has undertaken extensive measures to protect it, and that disclosure would impair the Tri-C Foundation's ability to pay speakers the lowest fee possible, if the terms of Spencer's agreement are made known. Horton also maintains that the trade secret protection is not defeated by evidence that a similar contract that Spencer had with Kent State University was available online. In opposition, Sheil argues that Spencer's standard speaker's contract is readily available through multiple outlets in the public domain, and her contract to serve as the Kent State University commencement speaker during 2017 graduation program is also widely available.
Trade Secrets
{¶48} Trade secrets are exempt from public records disclosure under the "state or federal law" exemption of R.C. 149.43(A)(1)(v). State ex rel. Besser v. Ohio State Univ., 89 Ohio St.3d 396, 399, 2000-Ohio-207, 732 N.E.2d 373. "Exceptions to disclosure under the Public Records Act are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception." State ex rel. Miller v. Ohio State Hwy. Patrol , 136 Ohio St.3d 350, 2013-Ohio-3720, 995 N.E.2d 1175, ¶ 23. "A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception." Id.
{¶49} The Ohio Uniform Trade Secret Act, R.C. 1333.61(D), defines a "trade secret" as:
[I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
*206 (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
{¶50} When analyzing a trade secret claim, the court must consider:
(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. (Citation omitted.)
Salemi v. Cleveland Metroparks , 145 Ohio St.3d 408, 2016-Ohio-1192, 49 N.E.3d 1296, ¶ 25.
{¶51} In this matter, as noted by the special master,
[disclosure would not] reveal any "scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement." Respondent asserts only that the terms are "business information that (1) derives independent economic value, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." * * * Respondent does not identify any term with particularity as trade secret other than "fees" paid.
Sheil I, 2018-Ohio-1720 at ¶¶ 42-43. Similarly, the judge agreed that the document was not a protected trade secret. Sheil II, 2018-Ohio-2355 at ¶ 54. We likewise concur with this conclusion.
{¶52} In State ex rel. Plain Dealer v. Ohio Dept. of Ins. , 80 Ohio St.3d 513, 529, 687 N.E.2d 661 (1997), the court discussed the public availability of the information at issue and stated:
R.C. 1333.61 grants a document trade secret status only if the information is not generally known or readily ascertainable to the public. R.C. 1333.61(D)(1). Here, many of the documents compiled in the Memoranda are already public documents, such as the title to properties owned by Blue Cross, matters involving its financial structure that appear regularly on its annual statement, and pending litigation. Although some of the other information may not have been released into the public domain, the presence of information already made public prevents us from concluding that the Memoranda, as a whole, is a document that is not generally known to the public.
State ex rel. Plain Dealer v. Ohio Dept. of Ins. , 80 Ohio St.3d 513, 529, 687 N.E.2d 661 (1997). However, the court will not decline to classify a document as a trade secret where some but not all of the contested documents are publicly available if the unified result would afford a party a competitive advantage. State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio EPA , 88 Ohio St.3d 166, 175, 724 N.E.2d 411.
{¶53} In this case, we agree that the agreement pertains to "financial information" within R.C. 1333.61(D). However, the Tri-C Foundation cannot establish that the Spencer contract "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper *207 means[.]" As noted by both the special master and the judge, key information about Spencer's similar contracts is publicly available, including information revealing Spencer's speaking fee, a guaranteed fee, terms for the reimbursement of travel and expenses, and other requirements. Sheil I, 2018-Ohio-1720 at ¶ 47; Sheil II, 2018-Ohio-2355 at ¶ 53. On this record, the essence of the information is known by individuals "inside" and "outside" the business, there is little savings to be recognized from further protection of the information, and others are able to easily duplicate and acquire the information.
{¶54} Therefore, Horton's cross-assignment of error is without merit.
{¶55} The portion of the Court of Claims order that concluded that the Tri-C Foundation did not meet the functional equivalent of a public office is reversed, and the portion of the order that concluded that the Spencer contract is not a protected trade secret is affirmed. Respondent must provide Sheil with an unredacted copy of the Spencer contract as submitted under seal.
{¶56} Judgment affirmed in part and reversed in part.
MARY EILEEN KILBANE, P.J., and SEAN C. GALLAGHER, J., CONCUR