[Cite as *Schutte v. Gorman Heritage Farm Found.*, 2019-Ohio-1611.]

| | |
|---|---|
| ALAN SCHUTTE | Case No. 2018-01029PQ |
| Requester | Special Master Jeffery W. Clark |
| v. | <u>REPORT AND RECOMMENDATION</u> |
| GORMAN HERITAGE FARM FOUNDATION | |
| Respondent | |

{¶1} On May 14, 2018, requester Alan Schutte sent a public records request to respondent Gorman Heritage Farm Foundation (Gorman Foundation) asking that the following be sent to him in electronic format or paper copies:

1. PROFIT AND LOSS REPORT

Shows two years' worth of data (YTD $ change and YTD % change) through March 31, 2018

2. TRANSACTION DETAIL BY ACCOUNT

Shows all 2018 transactions through March 31, 2018

3. BALANCE SHEET DETAIL

Shows two years' worth of data, (YTD $ change and YTD % change) as of March 31, 2018

4. 2018 BUDGET

Entire 2018 budget.
Planned 2018 Budget versus actual expenditures through March 31, 2018.

5. EMPLOYEE COMPENSATION

January 1, 2016 through March 31, 2018
Total annual compensation paid to each full and part time Employee

(Complaint Exh. A.) On June 27, 2018, Tricia Watts, Executive Director of the Gorman Heritage Farm responded that the Foundation provides services under a contract with the Village of Evendale, but, as a separate and distinct 501(c)(3) non-profit entity, is not subject to the Public Records Act. (Complaint Exh B.) Watts stated that the Farm has complied with the requirements of R.C. 149.431 by providing transaction level financial records to village officials. (*Id.*) The letter attached copies of "the Farm's 2017 Year End Financial Statement, 2016 990 filing, and a copy of our 2016 accounting review performed by Flynn and Company," and promised, "[w]e will share the most recent accounting and 990 information when it becomes available." (*Id.*) [1]

{¶2} On June 29, 2018, Schutte filed a complaint under R.C. 2743.75 alleging denial of access to public records in violation of R.C. 149.43(B). The Gorman Foundation filed a combined response and motion to dismiss (Response). On October 22, 2018, Schutte filed a memorandum in opposition to the motion to dismiss (Reply). On November 20, 2018, the Foundation filed copies of withheld responsive records, under seal.

{¶3} Schutte's claims will be evaluated under the standard of clear and convincing evidence. *Hurt v. Liberty Twp.*, 2017-Ohio-7820, 97 N.E.3d 1153, ¶ 27-30 (5th Dist.).

**Motion to Dismiss**

{¶4} The Gorman Foundation moves to dismiss the complaint as failing to state a claim for which relief may be granted. In construing a motion to dismiss pursuant to Civ.R. 12(B)(6), the court must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). Then, before the court may dismiss the complaint, it must appear beyond doubt that plaintiff can prove no

---

[1] The Foundation attached the 2017 IRS 990 form to its Nov. 20, 2018 notice of filing at p. 65-98.

set of facts entitling him to recovery. *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975).

{¶5} The complaint is based on a public records request that reasonably identifies the records sought (Complaint, Exh. A), and on evidence that the Gorman Foundation partially denied the request. (*Id.*, Exh. B.) The complaint alleges that the Foundation is the functional equivalent of a public office, and is also an entity providing government services under contract. The allegation of functional equivalence is supported by a list of twenty relevant factual assertions (*Id.*, Exh. C), and the Foundation concedes its contractor status in its response letter. (*Id.*, Exh. B.) I find that Schutte sufficiently states a claim of violation of R.C. 149.43(B). I therefore recommend that the motion to dismiss be denied, and the case determined on the merits.

### Factors Considered in Determining Functional Equivalence

{¶6} The Public Records Act applies to "records kept by any *public office.*" R.C. 149.43(A)(1). As used in the Act:

> "Public office" includes any state agency, *public institution*, political subdivision, or any other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government.

(Emphasis added.) R.C. 149.011(A). The mere fact that it is a private, non-profit corporation does not preclude an entity from being a public office. *State ex rel. Freedom Communications, Inc. v. Elida Community Fire Co.*, 82 Ohio St.3d 578, 579, 697 N.E.2d 210 (1998). A private entity is a "public institution" under R.C. 149.011(A), and thus a public office for purposes of the Public Records Act, when it serves as the "functional equivalent" of a public office. *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, ¶ 21-26. Under the functional equivalence test the court must analyze all pertinent factors including the following four:

> (1) whether the entity performs a governmental function,
> (2) the level of government funding,
> (3) the extent of government involvement or regulation, and

(4) whether the entity was created by the government or to avoid the requirements of the Public Records Act.

*Id.* at ¶ 25. *Oriana House* did not require that all four factors be *satisfied*, as respondent argues, but only that they be analyzed. *Id*. Proof of any single factor is not essential:

> Applying the functional-equivalency test requires a case-by-case analysis, examining all pertinent factors *with no single factor being dispositive*. See *Ry. Labor Executives Assn. v. Consol. Rail Corp.* (D.C.D.C.1984), 580 F.Supp. 777, 778 ("All relevant factors are to be considered cumulatively, *with no single factor being essential* or conclusive")

(Emphasis added.) *Id*. at ¶ 23.

{¶7} Nor does *Oriana House* restrict courts from considering factors in addition to the required four, instead encouraging examination of "*all* pertinent factors." *Id*. at ¶ 23, 25, and paragraph two of the syllabus. *See also Sheil v. Horton,* 8th Dist. Cuyahoga No. 107329, 2018-Ohio-5240, ¶ 39-41. The Supreme Court noted that the list of factors considered by other courts in determining functional equivalence was non-exhaustive. *Oriana House* at ¶ 22. The Court did not overrule its previous rulings as to whether various private entities were public institutions, instead recognizing that in those cases it had "considered factors similar to the factors in the functional-equivalency test in making the determination." *Id*. at ¶ 24. The Court listed the following factors as having been considered in its previous cases, in cases from other courts, or both:

1. Whether the entity is a public hospital. *Id*. at ¶ 17, 19, 24.
2. Whether the entity renders a public service to residents. *Id. at* ¶ 17, 19, 20, 24.
3. Whether the entity receives support from public taxation. *Id*. at ¶ 17, 19, 20, 24.
4. **Whether the entity performs a governmental function**. *Id*. at ¶ 22.
5. **The level of government funding**. *Id*. at ¶ 22.
6. **The extent of governmental involvement or regulation**. *Id*. at ¶ 22.
7. **Whether the entity was created by the government**. *Id*. at ¶ 22.

8. Whether the entity's board members, officers or employees are government officials or employees. *Id.* at ¶ 22, 24.

9. Whether the entity acts as a major gift-receiving and soliciting arm of a public university. *Id.* at ¶ 24.

10. Whether the entity's employees participate in a public employee retirement system. *Id.*

11. Whether the trustees of the entity are appointed by county officials. *Id.*

12. Whether the entity decides the terms and conditions of employment for operational staff. *Id.*

To these previously considered factors, the *Oriana House* Court added a new one:

13. **Whether the entity was created to avoid the requirements of the Public Records Act**. *Id.* at ¶ 25.

The highlighted factors are those that *Oriana House* now requires be analyzed in every case. The factors listed as numbers 3, 8, and 10, and possibly others, may be subsumed in the highlighted factors, leaving the others as additional factors that may be considered if pertinent. Even this larger list is non-exhaustive. For example, the Eighth District has considered the treatment of a private non-profit corporation as a public entity by the Ohio auditor as an additional factor. *Sheil* at ¶ 41.

{¶8} In the absence of a precise legislative definition of what constitutes a *public institution*, the consideration of all pertinent factors with no single factor being essential or determinative best allows the court to determine overall functional reality. "A case by case application of the factors noted above is best suited to ensure that the general rule of disclosure underlying the state's [Freedom of Information Act] is not undermined by nominal appellations which obscure functional realities." *Bd. of Trustees of Woodstock Academy v. Freedom of Information Comm.* (1980), 181 Conn. 544, 555-556, 436 A.2d 266), as cited by *Oriana House* at ¶ 23. The functional equivalence analysis is thus a case-by-case, fact-based inquiry into the functional realities of a putative public

institution based on the totality of all pertinent factors. *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, ¶ 24, 38-39.

{¶9} The court's analysis begins with the presumption that private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office. *Oriana House* at ¶ 26. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**Application of the Functional Equivalence Test to the Gorman Foundation**

**(1) Whether the Entity Performs a Governmental Function**

{¶10} In applying the first factor of the functional equivalency test, courts must consider whether the private entity performs a function that is traditionally or historically performed by the government. *Oriana House* at ¶ 28. In some cases, courts have found that a private entity performs both governmental and non-governmental functions. *Nova Behavioral Health* at ¶ 27-30 (a private entity performed non-governmental functions to the extent it provided mental health services generally but performed a governmental function to the extent it provided such services to community members who were unable to pay). This is such a case.

{¶11} The evidence shows that the Gorman Foundation performs two general functions at the Gorman Family Farm. First, it operates a working farm by raising and selling livestock and crops. (Geeding Aff. at ¶ 10; Contract, Article II, § 2.3.)[2] Farming is

---

[2] The contract between the Village of Evendale and the Gorman Heritage Farm Foundation is attached as Exhibit 3 to the Geeding Affidavit.

not traditionally a governmental function. The fact that the Gorman Foundation is farming on publicly-owned land pursuant to a contract with Evendale does not change the nongovernmental nature of the function. *See State ex rel. Luken v. Corp. for Findlay Mkt. of Cincinnati*, 2012-Ohio-2074, 972 N.E.2d 607, ¶ 22 (1st Dist.) (a private entity was not performing a governmental function when it contracted with a city government to run a public, city-owned market).

{¶12} Second, the Gorman Foundation operates the Gorman Family Farm as a public recreation area that includes walking and hiking trails. (Geeding Aff. at ¶ 5; Contract, Article XII, § 12.2.) The Farm is required to grant free daily admission to residents of Evendale. (Contract, Article II, § 2.3.8.) In this respect, the Gorman Foundation functions much like a park service. The Gorman Foundation provides educational programs to inform the general public about agriculture, nutrition, sustainability, and the environment. (Contract, Article II, § 2.4.) The operation of public parks and recreation areas is well established as a historically governmental function in Ohio. *See e.g.* R.C. 755.01 et seq.; R.C. 2744.01(C)(2)(u); *Hicks v. Newtown*, Ct. of Cl. No. 2017-00612PQ, 2017-Ohio-8952, ¶ 22-24.

{¶13} Because the Gorman Foundation performs a mixture of governmental and nongovernmental functions, this factor weighs partly but not fully in favor of finding that the Foundation is the functional equivalent of a public office.

### (2) Level of Government Funding

{¶14} "The fact that a private entity receives government funds does not convert the entity into a public office for purposes of the Public Records Act." *Oriana House* at ¶ 29. However, the degree to which a private entity's funding comes from government sources is a relevant factor in determining whether the entity is the functional equivalent of a public office for purposes of the Act. *Id.* at ¶ 32. When applying the functional equivalency test, courts have considered what percentage of a private entity's total revenues come from public sources. *E.g., Id.*; *Nova Behavioral Health* at ¶ 32. In

appropriate cases, public funds are considered as a proportion of the entity's operating expenses instead of total revenues. *E.g., Sheil v. Horton*, 8th Dist. Cuyahoga No. 107329, 2018-Ohio-5240, ¶ 29-30. Courts have also considered whether public sources provide "significant support" other than direct funding, such as the provision of office space or computer support. *E.g., State ex rel. ACLU of Ohio v. Cuyahoga County Bd. of Comm'rs*, 128 Ohio St.3d 256, 2011-Ohio-625, 943 N.E.2d 553, ¶ 10, 51. The evidence in this case enables analysis of the Gorman Foundation's public funding as a percentage of its overall operating budget and consideration of additional, non-financial support from Evendale.

{¶15} The level of support the Foundation receives from public sources is significant. Evendale annually contributes $300,000 to the Gorman Foundation for general expenses and $65,000 for capital improvements. (Contract, Article III, § 3.1-3.2.) Additionally, Evendale provides non-financial support in the form of waste and recycling services, grass cutting, and snow removal. (Contract, Article IV, § 4.1-4.2.) These annual contributions account for 30 to 40 percent of the Foundation's yearly budget. (Geeding Aff. at ¶ 15.) On one occasion, Evendale made an additional financial gift to the Gorman Foundation in the amount of $148,500, which was derived from the sale of a village-owned property that the Foundation helped maintain. (Geeding Aff. at ¶ 22-23.) The Gorman Foundation's remaining operational funding comes from private donations, visitor admission fees, and volunteer service. (Geeding, Aff. at ¶ 15.)

{¶16} The level of funding and non-financial support Evendale provides the Gorman Foundation is consistent with levels of public funding that courts have found to be substantial. *E.g., Luken* at ¶ 26 (city funding of a non-profit entity was "not just significant, but overwhelming" when city funding accounted for almost half the entity's revenue). However, there are cases in which courts found entities receiving substantially higher levels of public funding not to be the functional equivalent of public offices. *E.g., Oriana House* at ¶ 32, 35 (88 percent of total revenues from public

sources); *Nova Behavioral Health* at ¶ 32, 38 (92 percent of revenue from public funding). On balance, I find that this factor weighs moderately in favor of finding that the Gorman Foundation is the functional equivalent of a public office.

### (3) Extent of Government Involvement or Regulation

{¶17} When considering the extent of governmental involvement with or regulation of a private entity, courts evaluate a spectrum of potential governmental control ranging from a "hands-off" approach on the low end through involvement in the day-to-day operations of the private entity on the high end. *Oriana House* at ¶ 33; *Nova Behavioral Health* at ¶ 34. However, day-to-day control is not necessary if other facts suggest that the governmental entity and private entity are closely intertwined. *Sheil* at ¶ 35. In evaluating this factor, courts have considered statutory requirements and contractual terms governing the relationship between the government and the private entity. *See Nova Behavioral Health* at ¶ 34. These considerations include whether public officials serve as board members or employees of the private entity and whether the public and private entity share facilities, equipment, or other administrative services. *Id.* at 35. In *Sheil*, the court of appeals found it significant that the public entity and private entity were co-located in the public entity's facilities and shared staff time, office services, technological services, office equipment, web servers, and a website, even though there was no day-to-day control of the private entity. *Sheil* at ¶ 33.

{¶18} The evidence in this case suggests that Evendale's direct involvement with the Gorman Foundation is limited. Evendale does not appear to have control over the Foundation's day-to-day operations. There is no cited statute or ordinance giving Evendale regulatory control over the Gorman Foundation. Under the terms of the contract, the Gorman Foundation provides the "labor, supervision, materials, and other services required to manage, operate, and maintain the Gorman Farm." (Contract, Art. II, § 2.1.) Additionally, the Gorman Foundation is solely responsible for the management

of all employees and maintains its own worker's compensation and employer's liability insurance. (Geeding Aff. at ¶ 16; Contract, Article V, § 5.1.)

{¶19} The contract does impose some conditions on the Gorman Foundation's operations and other activities. For example, the Gorman Foundation is required to maintain a "healthy balance" between varieties of crop and livestock, and changes to the buildings, property, and equipment require permission from Evendale. (Contract, Art. II, § 2.3.1.) The contract also imposes requirements for insurance coverage (Contract, Art. VI, § 6.1), and annual reporting. (Contract, Art. I, § 1.4-1.5.) In *Nova Behavioral Health* at ¶ 34, the Ohio Supreme Court observed:

> The statutory monitoring requirements, as well as the various contractual terms that the Repository cites as examples of "the high degree of control the Board has over Respondent," do not constitute day-to-day supervision. These requirements and stipulations constitute only the control necessary to ensure that government funds are properly used and to protect the government's interest in the development of an effective community-based mental-health system.

*See also State ex rel. Dist. Eight Reg'l Org. v. Cincinnati-Hamilton Cmty. Action Agency*, 192 Ohio App.3d 553, 2011-Ohio-312, 949 N.E.2d 1022 (1st Dist.) ("The statute providing for the designation of community-action agencies and the accompanying regulations are directed toward ensuring proper use of grant money.").

{¶20} Here, the contractual terms similarly protect the proper use of Evendale's funds and the maintenance of the Gorman Family Farm consistent with the restrictive covenants imposed upon Evendale by the general warranty deed. However, the contractual terms leave the Gorman Foundation a large degree of discretion regarding how to maintain the property, run farming operations, and conduct educational programs. Evendale does not control what crops are planted when, what livestock is raised, who performs what activities, etc.

{¶21} While the lack of day-to-day control of the Gorman Foundation is not dispositive, this case is distinguishable from *Sheil* in that there is little additional

evidence of close involvement between Evendale village government and the Gorman Foundation. Although Evendale owns the buildings and equipment at the Farm, there is no indication that the Foundation shares facilities, equipment, or administrative office services with any other department of the village government. No Evendale officials or employees are *ex officio* members of the Foundation's board. *Sheil* at ¶ 32 (the presence of two *ex officio* board members tended to show involvement); *Nova Behavioral* at ¶ 35 (noting the absence of government officials or employees on the board or staff of the private entity); *Oriana House* at ¶ 6 ("Oriana House has a six-member board of directors; none of the directors holds public office."). In fact, the contract between Evendale and the Gorman Foundation explicitly prohibits employees of the Foundation from working for the village. (Contract, Article V, § 5.2.) While Evendale employees may volunteer for the Gorman Foundation, no person may work or volunteer in a dual capacity for the Foundation and Evendale. (Contract, Art. V, § 5.4.) Although the Foundation is accountable to Evendale in some respects—understandable given the contractual relationship—the evidence shows that the Gorman Foundation generally operates as an independent entity with a distinct identity. I find that this factor weighs minimally in favor of finding that the Gorman Foundation is the functional equivalent of a public office.

### (4) Whether the Entity Was Created by the Government or to Avoid the Requirements of the Public Records Act

{¶22} The final functional equivalence factor concerns whether the private entity was created by the government *or* to avoid the requirements of the Public Records Act. *See Sheil* at ¶ 38 (noting "the disjunctive aspect of this element of the test."). The parties in this case agree that the Gorman Foundation was not established to avoid compliance with the Public Records Act. (Response at 10-11; Reply at 7.) However, the court must still consider what role Evendale played in the creation of the Foundation.

{¶23} The evidence shows that Evendale had a significant role in establishing the Foundation. Evendale's village charter explicitly authorized the creation of the Gorman Foundation, and stipulated that it be "a charitable non-profit Ohio corporation which shall be qualified as an IRC 501(c)(3) tax exempt entity to operate, maintain, and manage some or all of the Gorman Heritage Farm and the programs associated with it." (Geeding Aff., Exh. 2 Village Charter, Art. V, § 3.) *See Luken* at ¶ 25. ("Because the city requested the creation of a nonprofit corporation to manage and operate Findlay Market, we * * * find that the city created CFMC."). Furthermore, the initial articles of incorporation creating the Foundation appointed Timothy Burke as statutory agent. (Response at 85.). Burke was formerly the law director for Evendale. (Response at 11). *See Sheil* at ¶ 37 (noting that an officer of the public entity incorporated the private entity and served as the statutory agent). However, it does not appear that any of the initial incorporating directors were Evendale officials or employees. On balance, I find that this factor weighs moderately in favor of finding that the Foundation is the functional equivalent of a public office.

**Weighing of Factors**

{¶24} In this case, the four primary *Oriana House* factors do not point neatly in one direction. The Gorman Foundation performs a year-round nongovernmental function in running a working farm, controls its own day-to-day operations and employees, and was not created to avoid compliance with the Public Records Act. On the other hand, the Gorman Foundation performs significant functions akin to a public park service on government land. Evendale provides a significant level of the Gorman Foundation's funding, and played a key role in its creation.

{¶25} These facts and circumstances must be considered under the presumption that private entities are not subject to the Public Records Act "absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office." *Oriana House* at ¶ 26.  "It ought to be difficult for someone to compel a private

entity to adhere to the dictates of the Public Records Act." *Id.* at ¶ 36. While some moderate indicia of functional equivalence are present, I find that requester has not shown by clear and convincing evidence that the Gorman Foundation is the functional equivalent of a public office for purposes of the Public Records Act.

**Quasi-Agency Theory**

{¶26} Schutte asserts that "[e]ven if this court were to hold that the Foundation is not Evendale's functional equivalent, the Foundation would still need to produce the records under the quasi-agency theory," citing *State ex rel. American Center for Economic Equality v. Jackson*, 2015-Ohio 4981, 53 N.E.3d 788, ¶ 15 (8th Dist.). (Reply at 8.) Schutte, however, waived this claim because he could have raised, but failed to raise, the claim in the complaint. *Nova Behavioral Health* at ¶ 40-41.

**Documents Designated as Public Records by R.C. 149.431**

{¶27} All items that meet the statutory definition of "public record" in R.C. 149.43(A)(1) are subject to the Public Records Act, unless exempted. Further, the General Assembly has designated certain items as public records regardless of whether they meet the statutory definition, e.g., R.C. 149.434 (list of employee birth dates "is a public record"). Here, R.C. 149.431 "requires the disclosure of certain financial and compensation records of nonprofit corporations and associations with government-service contracts under specified circumstances, even if they are not public offices for purposes of R.C. 149.43." *State ex rel. Bell v. Brooks*, 130 Ohio St.3d 87, 2011-Ohio-4897, 955 N.E.2d 987, ¶ 31; *Oriana House* at ¶ 30-32. R.C. 149.431 provides, in pertinent part:

> (A) * * * [A]ny nonprofit corporation or association * * * that enters into a contract or other agreement with * * * a political subdivision or taxing unit of this state for the provision of services shall keep accurate and complete financial records of any moneys expended in relation to the performance of the services pursuant to such contract or agreement according to generally accepted accounting principles. *Such contract or agreement and such financial records shall be deemed to be public records* as defined in

division (A) (1) of section 149.43 of the Revised Code and are subject to the requirements of division (B) of that section, except that: * * *

(3) Any nonprofit corporation or association that receives both public and private funds in fulfillment of any such contract or other agreement is not required to keep as public records the financial records of any private funds expended in relation to the performance of services pursuant to the contract or agreement.

(B) Any nonprofit corporation or association that receives more than fifty per cent of its gross receipts * * * in a calendar year in fulfillment of a contract or other agreement for services with a governmental entity shall maintain *information setting forth the compensation of any individual serving the nonprofit corporation or association in an executive or administrative capacity*. Such information *shall be deemed to be public records* as defined in division (A)(1) of section 149.43 of the Revised Code and is subject to the requirements of division (B) of that section.

Nothing in this section shall be construed to otherwise limit the provisions of section 149.43 of the Revised Code.

(Emphasis added.) R.C. 149.431 requires disclosure of all records that the Gorman Foundation is required by the statute to create and maintain in relation to performance of its services to the village. R.C. 149.431 does not require the Gorman Foundation to disclose any documents that do not fall under these terms, even if additional records are provided to the village under the contract or other practices of the parties.

{¶28} Gorman Foundation asserts that its 2018 Budget is a prediction of future expenditures rather than a record of "moneys expended" and thus is not a document required to be disclosed under R.C. 149.431(A). (Response at 13.) Based on the common definition of a budget,[3] and the use of the past tense in requiring disclosure of records of moneys *expended*, I find that R.C. 149.431(A) does not apply to Request No. 4 for the Gorman Foundation's "2018 Budget."

---

[3] https://dictionary.cambridge.org/us/dictionary/english/budget (accessed March 5, 2018.)

{¶29} Gorman Foundation asserts that it is not required to comply with Request No. 5 for the "[t]otal annual compensation paid to each full and part time Employee" of the Foundation because it does not receive "more than fifty per cent of its gross receipts * * * in a calendar year in fulfillment of a contract or other agreement for services with a governmental entity." R.C. 149.43(B) (Response at 14; Geeding Aff. at ¶ 13-15.) Schutte disputes the actual percentage of gross receipts that Gorman Foundation derives from the Village of Evendale. (Reply at 6-7.) However, assuming *arguendo* that the Gorman Foundation is subject to R.C. 149.431(B), it would be obliged to disclose only "the compensation of any individual serving the nonprofit corporation or association in an executive or administrative capacity." Gorman Foundation asserts that it has already done so for 2016 and 2017 in the IRS 990 forms provided to Schutte. (Documents filed Nov. 20, 2018 at 36, 71) I find that this claim is thus moot.

{¶30} Gorman Foundation asserts that the "remaining requests for the (1) Profit and Loss Report; (2) Transaction Detail by Account; and (3) Balance Sheet Detail have already been fulfilled by Gorman," rendering the demand for production of these documents moot. (Response at 15.) The evidence before the court does not support this assertion. The Gorman Foundation did provide various documents containing financial information from FY 2017 (Documents filed Nov. 20, 2018 at 8-12), for years ended Dec. 31, 2016 and 2015 (*Id.* at 13-28), and for calendar years 2016 and 2017. (*Id.* at 29-115.) However, the Foundation provided no records responsive to Requests Nos. 1, 2, or 3 that carried through to March 31, 2018, as requested.

{¶31} The June 27, 2018 letter from Tricia Watts (*Id.* at 4-5) indicates that the Foundation has responded to a functionally identical village request for the same financial and compensation information on an ongoing, monthly basis (*Id.* at 7) by providing the village "with almost all that information including Year over Year comparisons of the prior 2 years of financial data, prior 2 years of Balance Sheet data, prior two years of transaction level data." The Foundation therefore concedes that it

maintains these records. A review of the records the Foundation filed under seal reveals several records responsive to Requests Nos. 1 and 3 that are subject to disclosure under R.C. 149.431, to the extent that they are responsive. These records are:

1. Gorman Heritage Farm Profit and Loss Report, January – December 2017 (Bates No. GOR 000001-000006);

2. Gorman Heritage Farm Prior Year Balance Sheet Comparison as of December 31, 2017 (Bates No. GOR 000007-000008);

3. Gorman Heritage Farm Balance Sheet as of December 31, 2017 (Bates No. GOR 000041-000042);

4. Gorman Heritage Farm Profit and Loss Report, January – December 2017 (Bates No. GOR 000043-000047);

5. Gorman Heritage Farm Profit and Loss Report, January – March 2018 (Bates No. 000076-000080);

6. Gorman Heritage Farm Prior Year Balance Sheet Comparison as of March 31, 2018 (Bates No. GOR 000081-000082);

7. Budget vs. Actuals sheets for Jan.-March 2018 (Bates No. GOR 000083-000093).

The Foundation also filed 2016 and 2017 Transaction Lists by Date. (Bates No. GOR 000048-000075.) These lists appear to be spreadsheets, and contain a column headed "Account." While these specific lists are not responsive to Schutte's Request No. 2 for 2018 transactions by account, the evidence suggests that the same database can be sorted to produce a 2018 Transaction List by Account using software standard to electronic spreadsheets. *See Welsh-Huggins v. Office of the Prosecuting Atty.*, Ct. of Cl. No. 2018-00793PQ, 2019-Ohio-473, ¶ 34-35. The transactions database constitutes "financial records of any moneys expended," and is therefore both maintained by the Foundation, and responsive to Request No. 2 to the extent that the transactions reflect

"moneys expended in relation to the performance of the services pursuant to" the contract with the village.

{¶32} I find that Gorman Foundation must disclose all additional records it maintains pursuant to R.C. 149.431 that are responsive to Requests 1, 2, and 3, in any available electronic format. The Foundation is entitled to redact "the financial records of any private funds expended in relation to the performance of services pursuant to the contract or agreement," R.C. 149.431(A)(3), although in its previous release of several 2016 and 2017 records it refrained from doing so in the interest of transparency. Notably, the Foundation asserts that the records it sends to the village would be available to a public records request made there. (Response at 4-5; Complaint, Exh. B.)

{¶33} The remaining records filed under seal include a 2018 Strategic Plan, Gorman Foundation employee job descriptions, and the 2016 and 2017 W2 forms for Gorman Foundation employees. As noted above, these are not records of "moneys expended" or executive compensation and thus are not subject to disclosure under R.C. 143.431.

### Conclusion

{¶34} Upon consideration of the pleadings and attachments, I recommend the court find that Schutte has failed to show by clear and convincing evidence that the Gorman Foundation is the functional equivalent of a public office. I further recommend the court find that the Foundation must disclose all records responsive to Requests Nos. 1, 2, and 3 that fall within the scope of R.C. 143.431, as detailed herein. I recommend that the court deny requester's claim for production of records responsive to Request No. 4. I recommend the court find that the claim for records responsive to Request No. 5 has been rendered moot.

{¶35} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state with*

*particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*


JEFFERY W. CLARK
Special Master

**Filed March 15, 2019**
**Sent to S.C. Reporter 4/30/19**