## MERI-WEATHER, INC., ET AL. *v.* FREEDOM OF INFORMATION COMMISSION ET AL.

Superior Court       Judicial District of       File No. CV99-0494415S
                         New Britain

Memorandum filed March 27, 2000*

*David L. Metzger*, for the plaintiffs.

*Victor R. Perpetua*, appellate attorney, for the named defendant.

*Christopher P. Hankins*, deputy city attorney, for the defendant Mark Benigni.

HON. ROBERT SATTER, JUDGE TRIAL REFEREE. The named plaintiff, Meri-Weather, Inc.,[1] appeals from a decision of the named defendant, the freedom of information commission (commission), requiring it to grant access to certain documents relating to its finances. The central issue is whether the plaintiff is a public

---

* Affirmed. *Meri-Weather, Inc.* v. *Freedom of Information Commission*, 63 Conn. App. 695, 788 A.2d 1006 (2001).

[1] Gregory P. Haskins, the chief executive officer of Meri-Weather, Inc., also is a plaintiff. The court refers to Meri-Weather, Inc., as the plaintiff in this opinion.

agency within the meaning of General Statutes § 1-200 (1)[2] of the Freedom of Information Act, General Statutes § 1-200 et seq.

The facts as found by the commission's hearing officer and supported by substantial evidence are as follows. The plaintiff was created as a nonprofit § 501 (c) corporation in 1983. See 26 U.S.C. § 501 (c) (4). Its origin was the result of a study group of Meriden citizens and organizations composed of clergy, social service agencies, labor unions, community groups and private businesses recommending to the Meriden community action agency (MCAA) that a nonprofit, community based economic development corporation be established. The MCAA itself was created by the Meriden city council "as the agency responsible for the conduct and administration in the city of Meriden of community action programs pursuant to the federal Economic Opportunity Act of 1964 [as amended by 42 U.S.C. § 2701 et seq.] and the Human Resource Development programs pursuant to the State Community Development Act of 1967." In another docket before the commission, the MCAA was found to be a public agency.

On the recommendation of the study group, the MCAA's board of directors directed its staff to form the plaintiff organization. All members of the plaintiff's board of directors initially were appointed by the MCAA's board of directors. The articles of incorporation of the plaintiff organization provide that four of its seven directors were to be appointed by the MCAA and

[2] General Statutes § 1-200 (1) provides in relevant part: " 'Public agency' or 'agency' means any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, including any committee of, or created by, any such office, subdivision, agency, department, institution, bureau, board, commission, authority or official, and also includes any judicial office, official, or body or committee thereof but only in respect to its or their administrative functions. . . ."

that decisions were to be made by the plaintiff by a majority vote of those members present, provided at least two MCAA designees were present. The plaintiff's articles of incorporation stated its purposes as follows: "[E]ncouraging the process of community-based economic development in minority, poor or disadvantaged communities . . . expand opportunities for low-income minority and disadvantaged individuals to enter into, own, manage, operate or be employed in business enterprise . . . and to promote and enhance the vitality and health of existing neighborhoods . . . ." The articles further provide: "The focus of the corporation will be on energy conservation, construction and housing rehabilitation, training and the creation of employment."

The plaintiff experienced four distinct phases of activity during the course of its existence: (1) 1983–1985, when the plaintiff operated actively; (2) 1986–1993, when the plaintiff was relatively inactive; (3) 1993–1996, when the plaintiff substantially engaged in a lead abatement program financed by a $380,000 grant by the Department of Health and Human Services and in an insulation program of Wrap-Up/Seal-Up under contract with Northeast Utilities; and (4) the present, when the plaintiff again is virtually inactive. During its active periods, the plaintiff also was the successful bidder for a number of other contracts involving removal of lead in public schools, rehabilitating houses for low income people and job training for the Department of Labor.

The executive director of the MCAA serves without compensation as the executive officer and fiduciary agent of the plaintiff. The plaintiff's financial records are maintained by the staff of the MCAA and kept on file in the MCAA's office. The plaintiff has its own project manager, who actually directs the work of lead removal, weatherizing and rehabilitation activities of the organization.

Throughout its existence, the plaintiff received income from the public and private contracts it performed and public grants from various sources for the programs it undertook. Only in 1994 did the plaintiff's state and federal grants exceed 30 percent of all of its revenues.

The hearing officer correctly identified the legal principles to be applied in this case. He cited *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 554, 436 A.2d 266 (1980), which noted that any general definition of what constituted a public agency within the meaning of § 1-200 (1) could be of only limited utility to a court confronted with a myriad of organizational arrangements for getting government business done and that each new arrangement had to be examined anew in its own context. The court adopted the "functional equivalent" test first enunciated in federal cases. Id., 553–54. That test employed the following four criteria: (1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government. Id., 554.

The hearing officer further recognized that in *Connecticut Humane Society* v. *Freedom of Information Commission*, 218 Conn. 757, 761, 591 A.2d 395 (1991), our Supreme Court held that all four factors were not necessary for a finding of functional equivalence, but rather that "all relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." The hearing officer further quoted our Appellate Court in *Domestic Violence Services of Greater New Haven, Inc.* v. *Freedom of Information Commission*, 47 Conn. App. 466, 475–78, 704 A.2d 827 (1998): "The key to determining whether an entity is a government agency or merely a contractor with the government is whether the government is really

involved in the core of the program . . . [and exercises] direct, pervasive or continuous regulatory control . . . [and the] government's control [of] the detailed physical performance." (Citations omitted; internal quotation marks omitted.)

Applying those factors in the manner indicated, the hearing officer determined that the level of government funding criterion had not been met, but that all the other factors had been met and, accordingly, concluded that the plaintiff is the functional equivalent of a public agency within the meaning of § 1-200 (1). He further concluded that the plaintiff violated the provisions of General Statutes § 1-210, formerly § 1-19, when it declined to permit the requested records to be disclosed and ordered that those records be disclosed forthwith.

Because the commission's decision requires the plaintiff to provide copies of all the requested documents, the court finds that the plaintiff is aggrieved within the meaning of General Statutes § 4-183 (a) of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, 226 Conn. 105, 120–21, 627 A.2d 1257 (1993).

The court reviews the issues raised by the plaintiff in accordance with the limited scope of judicial review afforded by the UAPA. *Dolgner* v. *Alander*, 237 Conn. 272, 280, 676 A.2d 865 (1996). The court may not retry the case or substitute its own judgment for that of the commission. *DiBenedetto* v. *Commissioner of Motor Vehicles*, 168 Conn. 587, 589, 362 A.2d 840 (1975). The conclusion reached by the commission must be upheld if it is legally supported by the evidence. The credibility of witnesses and the determination of factual issues are matters within the province of the administrative

agency, and if there is evidence that reasonably supports the decision of the commissioner, the court will not disturb the conclusion reached by him. *Hart Twin Volvo Corp.* v. *Commissioner of Motor Vehicles*, 165 Conn. 42, 49, 327 A.2d 588 (1973).

In this case, the interpretation of § 1-200 (1) presents a question of law. As stated in *Domestic Violence Services of Greater New Haven, Inc.* v. *Freedom of Information Commission*, supra, 47 Conn. App. 470–71, "[a]lthough the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . it is for the courts, and not for administrative agencies, to expound and apply governing principles of law. . . . Because the commission's determination of whether the plaintiff is a public agency required an interpretation of [§ 1-200 (1)], that determination was a matter of law." (Citation omitted; internal quotation marks omitted.)

In this case, the hearing officer has properly identified the factor to be considered in determining whether an organization is the functional equivalent of a government agency within the meaning of § 1-200 (1). This court must determine whether the commission properly applied those factors.

The commission found that the level of government funding criterion of the functional equivalence test had not been met. This court finds that there is substantial evidence to sustain that finding and, moreover, that neither party to this proceeding contests it. Consequently, it may be adopted by this court.

As to the factor of whether the plaintiff performs a governmental function, the hearing officer alluded to the purposes of the plaintiff's articles of incorporation, as previously discussed, and stated: "More specifically, it is found that the primary activities of the [plaintiff] have been to upgrade energy conservation and lead

abatement programs, both of which activities implemented public policy initiatives of the U.S. Congress and the Connecticut General Assembly." The decision of the hearing officer went on to state: "While such social welfare programs are not universally supported as appropriate activities for government, it is beyond question as a matter of history and it is found that in the period from the 1960s to the 1990s, social welfare programs such as those operated by the [plaintiff] have been governmental functions. . . . The [plaintiff] therefore performed a governmental function."

General Statutes § 19a-111a provides that the commissioner of public health shall establish a lead poisoning prevention program, and may contract with individuals or groups to enter into assistance agreements with municipalities for the development and implementation of comprehensive lead poisoning prevention programs. General Statutes § 19a-111e provides that the department of public health may apply for and accept federal funds for lead poisoning prevention programs. General Statutes § 16a-40b provides that the commissioner of economic and community development may make loans to residents for energy conservation, and General Statutes § 16a-40c authorizes the state bond commission to issue bonds to fund such loans.

Lead abatement and energy conservation may be governmental functions pursuant to those statutes. When such programs are conducted by an organization as a contractor rather than as a governmental entity, however, the organization is not performing a governmental function within the meaning of § 1-200 (1). *Domestic Violence Services of Greater New Haven, Inc.* v. *Freedom of Information Commission*, supra, 47 Conn. App. 466, states: "Performing a government service *pursuant to contract* does not make an entity a public agency subject to the [Freedom of Information Act]. . . . The key to determining whether an entity is a government

agency or merely a contractor with the government is 'whether the government is really involved in the core of the program.' [*Forsham* v. *Califano*, 587 F.2d 1128, 1138 (D.C. Cir. 1978), aff'd, 445 U.S. 169, 100 S. Ct. 977, 63 L. Ed. 2d 293 (1980)]. Courts have held that entities that are the functional equivalent of a public agency have the power to govern or to regulate or to make decisions." (Citation omitted; emphasis added.) *Domestic Violence Services of Greater New Haven, Inc.* v. *Freedom of Information Commission*, supra, 474–75; see also *Envirotest Systems Corp.* v. *Freedom of Information Commission*, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 492648 (May 18, 1999) (24 Conn. L. Rptr. 511), aff'd, 59 Conn. App. 753, 757 A.2d 1202, cert. denied, 254 Conn. 951, 762 A.2d 900 (2000).

The plaintiff in this case has no power to govern, to regulate or to make decisions affecting government. It operates only through contracts with the government and private concerns. Thus, this court determines that the commission incorrectly applied the factor of performing a governmental function to the facts of this case, and that factor has not been met.

As to the factor of whether the plaintiff was created by government, the hearing officer found that the MCAA's board of directors directed its staff to form the plaintiff. The MCAA's board of directors initially appointed the plaintiff's board of directors, and the MCAA provided the original seed money for the plaintiff's start-up. The hearing officer concluded that the plaintiff was created directly by the MCAA, itself a public agency of government. Although the plaintiff contends that the initial idea for the creation of the plaintiff came from a study group of citizens and citizen organizations, substantial evidence in the record sustains the commission's finding that the plaintiff was created by the MCAA.

As to the final factor of the extent of government involvement or regulation, the commission based its conclusion that this factor had been met on evidence that the MCAA appoints a majority of the plaintiff's board (four out of seven directors), the plaintiff's board cannot act unless two MCAA appointed directors are present, the executive director of the MCAA serves as the chief executive officer of the plaintiff and its fiduciary agent, and all of the plaintiff's financial records are maintained by the staff of the MCAA and are on file at the MCAA's offices. Moreover, the record reveals that if, at an MCAA executive committee meeting, there were sufficient members of the plaintiff's board members present for a quorum, the plaintiff simultaneously conducted its own board meeting. While the actual activity of the plaintiff in performing lead abatement, weatherization and rehabilitation contracts was supervised by the plaintiff's project manager in the field, the MCAA, by appointing the majority of the plaintiff's board of directors and by having its executive director as the chief executive officer of the plaintiff, has not only considerable involvement with the plaintiff, but actual domination and control of the plaintiff.

Thus, the court concludes that two factors of the functional equivalence test support the commission's conclusion that the plaintiff is a public agency (the plaintiff was created by government, and there is considerable government involvement and control), and that two factors have not been established (level of governmental funding and performance of a governmental function). The court must consider the factors " 'cumulatively' "; *Connecticut Humane Society* v. *Freedom of Information Commission,* supra, 218 Conn. 761; and weigh them on the scale of the purpose of the Freedom of Information Act "in favor of the open conduct of government and free public access to

government records." *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 328, 435 A.2d 353 (1980); see *Board of Trustees* v. *Freedom of Information Commission*, supra, 181 Conn. 550.

The court gives dominant weight to the factor of the MCAA's having dominant control of the plaintiff by virtue of the MCAA's director constituting a majority of the plaintiff's board and the plaintiff effectively not being able to act without the concurrence of the MCAA's board members, the MCAA's executive director being the chief executive officer of the plaintiff and being paid by the MCAA, and all of the plaintiff's financial records being maintained and filed with MCAA. The plaintiff, thus, is virtually an alter ego of the MCAA. If the organizations were private corporations, under either the instrumentality or identity tests of *Zaist* v. *Olson*, 154 Conn. 563, 575, 227 A.2d 552 (1967), and *Saphir* v. *Neustadt*, 177 Conn. 191, 209–10, 413 A.2d 843 (1979), they could be treated as one.

The MCAA was formed by an ordinance of the Meriden city council to conduct community action programs pursuant to federal and state statutes. It was found by the commission to be a public agency. By the plaintiff's being the MCAA's alter ego, the court concludes that the plaintiff also is a public agency within the meaning of § 1-200 (1).

The appeal is dismissed.