[Cite as *Martin v. Accel Schools Ohio*, 2024-Ohio-5965.]

## IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| LAVAR MARTIN | Case No. 2024-00490PQ |
| Requester | Special Master Todd Marti |
| v. | <u>REPORT AND RECOMMENDATION</u> |
| ACCEL SCHOOLS OHIO | |
| Respondent | |

{¶1} This matter is before me for a R.C. 2743.75(F) report and recommendation. I recommend that the court: (1) order respondent to produce some of the records requested, subject redactions to protect third parties' statutory privacy rights, (2) award requester his filing fee and costs, (3) order respondent to pay the balance of the costs of this case, (4) deny all other relief.

## I.    Background.

{¶2} This case involves claims for access to the records of a private company that manages two community schools formed pursuant to R.C. Chapter 3314. Three considerations are relevant: the general nature of such schools and the private companies that operate them, the relationship between the respondent and two community schools, and the records request at issue/this action to enforce it.

### A.  Community schools and the private companies that operate them.

{¶3} A community school, Ohio's name for a charter school, is a school formed pursuant to a contract between a R.C. Chapter 1702 corporation and a state approved oversight entity. Once formed, the school is a public school and a political subdivision. R.C. 3314.01(B); *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 2006-Ohio-5512, ¶ 7; *Cordray v. Internatl. Preparatory School*, 2010-Ohio-6136, ¶¶ 22-24; *State ex rel. Electronic Classroom of Tomorrow v. Cuyahoga Cty. Court of Common*

*Pleas*, 2011-Ohio-626, ¶¶ 25-27; *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 32. It is also a public office within the meaning of R.C. 117.01(D). *Id.*; *Cordray*, 2010-Ohio-6136, ¶ 24.

{¶4} Community schools have all the defining features of a public body. They operate on public funding, operating funds from the State and grant funds from the federal government. R.C. 3314.08, R.C. 3314.081; R.C. 3314.082. They are therefore subject to state auditing requirements, ethics laws, and the Public Records Act. R.C. 3314.03(A)(8) and (11). Although community schools are exempted from some laws governing school districts, they must comply with most of the extensive bodies of state and federal law governing school districts. *Ohio Congress*, 2006-Ohio-5512, ¶¶ 30, 33, 110-175; I *Anderson's Ohio School Law Guide* § 2.27 (2024); *Baldwin's Ohio School Law*, § 48:7 (2023 update).

{¶5} Community schools are under the control of a "governing authority." That entity is roughly analogous to the board of education of a public school district. Adm. Code 3301-102-02(I).

{¶6} Although community schools are under the ultimate authority of their governing authorities, many are managed on a day-to-day basis by private companies. Those companies perform functions analogous the those performed by the administration of a public school district. They usually handle all aspects of a school's operations. That can include the establishment and implementation of the school's educational program, the hiring and supervision of staff, procuring a facility, equipment, and supplies, and managing the school's finances. See e.g. *Hope Academy*, 2015-Ohio-3716, ¶¶ 5, 42, 45. In sum, those companies "stand in the shoes of" the schools they manage and are the "de facto persona of" those schools. 1 *Anderson's* Ohio *School Law Guide* § 2.35.1 (2024); *Hope Academy*, 2015-Ohio-3716, ¶ 44.

**B. The relationship between the respondent and the two community schools involved in this case**.

{¶7} Accel Schools Ohio LLC ("Accel") manages two community schools in Cuyahoga County, Ohio College Preparatory School ("OCP") and Northeast Ohio College Preparatory School ("NEO") (collectively, the "Schools"). It has functionally identical

contracts with the governing authorities of each school. *PQ Miscellaneous*, *Affidavit of Linda Newton*, ("*Newton Aff.*"), filed October 23, 2024, p. 1, ¶¶ 2, 3; 1, ¶ 12. *PQ Miscellaneous*, *Exhibit A* ("*Contracts*"), pp. 1-38.

{¶8} Pursuant to those contracts, Accel manages every aspect of the Schools' operations. It hires, assigns, manages, and trains the Schools' employees, finds and maintains facilities for the Schools, provides food services, does the schools' purchasing, provides the Schools' technology, and handles their finances, payroll, and benefits. It also manages the School's academic affairs, setting their curriculum, instructional design, educational philosophy, fixing the levels of educational staffing, and handling student discipline. It takes care of the Schools' compliance with state educational laws, auditing requirements, and grant conditions. Also relevant here, Accel provides the Schools' executive leadership. Those executives are employed by Accel, rather than the Schools. *Contracts*, Art. II, Art. VI; *Newton Aff.* p. 4, ¶¶ 17, 18.

{¶9} Those services are funded by the Schools. They pay a flat 18% of their revenue (state and federal funds) as management fees, and reimburse Accel for the cost of the goods and services necessary to provide the services described above. *Contracts*, Art. IV; *Newton Aff.*, pp. 2-3, ¶¶ 10, 11; Ohio Auditor of State, *Single Audit, Ohio College Preparatory School, for the year ended June 30, 2023*, p. 41, notes. 13, 14, ("*OCP Audit*");[1] Ohio Auditor of State, *Single Audit, Northeast Ohio College Preparatory School, for the year ended June 30, 2023*, pp. 41-42, note 13, ("*NEO Audit*").[2]

**C. The records request at issue and this enforcement action**.

---

[1]https://ohioauditor.gov/auditsearch/Reports/2024/Ohio_College_Preperatory_School_2023_Cuyahoga_FINAL.pdf  (accessed November 25, 2024). The special master advised the parties that he was considering taking judicial notice of the Schools' audits and asked them to note any objection to his doing so. *Order*, entered, October 24, 2024. Neither party has objected, and the audits are certified.  The special master therefore takes judicial notice of those audits. See *State ex rel. Pike Cty. Convention & Visitor's Bur. v. Pike Cty. Bd. of Commrs.*, 2021-Ohio-4031, ¶ 2, n. 3.

[2]https://ohioauditor.gov/auditsearch/Reports/2024/Northeast_Ohio_College_Preparatory_School_2023_Cuyahoga_FINAL.pdf  (accessed November 25, 2024).

{¶10} Requester Lavar Martin was an employee of Accel who worked as the Assistant Dean of OCP. *PQ Sealed Document Filed*, filed October 23, 2024 ("*In Camera Docs.*"), pp. 193, 197, 204, 243, 249, 256.[3] He made a request for records related to persons who were part of the Schools' executive leadership and to persons who had similar roles in connection with other schools Accel manages:

> My request pertains to the employment files of all administrators, regional vice presidents, and regional directors of academics employed at Acee! Schools, specifically Ohio College Preparatory and Northeast Ohio College Preparatory School. I would appreciate receiving the documents electronically at my e-mail address, lavar.martin30@gmail .com .
>
> 1.The personnel files of Debroah Mays, Jennifer Turski, Nova O'Callaghan, Arnetta Crook, Ivy Dodd, Miysha Godfrey, Horold Booker, Darryl Owens, Lavar Martin, Temika Whitsett, Veda-Giles Weeks, Jeremiah Latimore, Barry Yancy, Emma Simpson.
> 2. Employment files of all administrators employed during the school years 2020-2024, inclusive of salary information, including the previously mentioned Names.
>
> 3. Details regarding the source of funding for each administrator's salary, regional vice presidents, and regional directors of academics, specifying whether it was funded by state, federal, public, or any other funds. Additionally, please provide details on the allocation and distribution of all funds.
>
> 4.Offer letters provided to the individuals selected for previously mentioned Names along with any other Dean of Students, Associate Dean of Students, Director of Student Culture not mentioned during the school years 2020-2024.
>
> 5. All documents relating to the interviewing and selection process for previously mentioned Names along with any Dean of Student,

---

[3] All references to specific pages of the *In Camera Docs.* are based on the Bates numbers Accel affixed to them.

Associate Dean of Student, Director of Student Culture not mentioned previously. *Complaint,* filed June 7, 2024, pp. 9-10 (sic).[4]

Accel responded that it had no public records responsive to this Mr. Martin's request. That was based on the fact that the individuals mentioned were employed by Accel rather than OCP or NEO. *Complaint,* pp. 7-8, 9; *Affidavit of Linda Newton*, p. 4, ¶¶ 17, 18.

{¶11} Mr. Martin disputes that response, and filed this case to challenge the denial. Mediation did not resolve the case, so a schedule was set for the parties to file evidence and memoranda supporting their positions. Those filings have been made, making the case ripe for decision. *Order Terminating Mediation*, entered October 2, 2024; *Order*, entered October 11, 2024. See also, *Notice of Extension of Time*, entered November 14, 2024.

## II. Analysis.

### A. The Court should deny respondent's motion to dismiss and decide this case on the merits.

{¶12} Accel asks the court to dismiss this case for lack of jurisdiction pursuant to Civ. R 12(B)(1) and for failure to state a claim pursuant to Civ. R. 12(B)(6). Neither basis is valid.

#### 1. This case is within the jurisdiction granted by R.C. 2743.03(A)(3)(b).

{¶13} Accel asserts that this case is beyond the jurisdiction granted by R.C. 2743.03(A)(3)(b) because it is not a state entity, a political subdivision, or an employee of such an entity, but instead is a private party. Accel overlooks the plain text of that statute in two important respects.

{¶14} *First, the assertion that R.C. 2743.03(A)(3)(b) only grants jurisdiction over state entities, political subdivisions, and their employees is rebutted by the legislature's use of the phrase "regardless of."* R.C. 2743.03(A)(3)(b) provides that:

In addition to its exclusive, original jurisdiction as conferred by divisions (A)(1) and (2) of this section, the court of claims has exclusive, original jurisdiction as follows:

---

[4] All references to specific pages of the *Complaint* are to the pages of the PDF copy posted on the court's docket.

***

(b) Under section 2743.75 of the Revised Code to hear complaints alleging a denial of access to public records in violation of division (B) of section 149.43 of the Revised Code, *regardless of whether the public office or person responsible for public records is an office or employee of the state or of a political subdivision*. (Emphasis added)

{¶15} The phrase "regardless of whether the public office or person responsible for public records is an office or employee of the state or of a political subdivision" makes a respondent's status as a state entity or a political subdivision immaterial. R.C. 1.42 mandates that "[w]ords and phrases shall be … construed according to … common usage." The word "regardless" is commonly used as a direction to proceed "without regard" to, "[w]ithout taking account of," and "irrespective of" the thing referred to. *Collin's Dictionary*;[5] Oxford *English Dictionary*,[6]  Consistent with that, Supreme Court precedent establishes that the phrase "'regardless of' means 'in spite of' or 'without taking into account,'" and that such a phrase "is not limiting but, rather, expansive." *State v. Kyles*, 2024-Ohio-5038, ¶ 13. R.C. 2743.03(A)(3)(b)'s grant of jurisdiction over public records claims "regardless of" whether the respondent "is an office or employee of the state or of a political subdivision," therefore grants jurisdiction over the claim "without regard" to, "[w]ithout taking account of," and "irrespective of" whether the respondent falls into one of those categories. That makes the fact that Accel is not a state entity or political subdivision immaterial to the existence of jurisdiction.

{¶16} *Second, Accel's assertion that R.C. 2643.03(A)(3)(b) does not contemplate jurisdiction over private parties is rebutted by the statute referring to a "person responsible for public records" as among the class of potential respondents*. R.C. 1.42 also mandates that "phrases that have acquired a technical or particular meaning . . .  shall be construed accordingly." R.C. 2743.03(A)(3)(b) was enacted in 2016. 2015 Ohio S.B. 321. It identifies disputes with a "person responsible for public records" as being within the jurisdiction it

---

[5] https://www.collinsdictionary.com/us/dictionary/english/regardless (accessed November 25, 2024).
[6] https://www.oed.com/dictionary/regardless_adj?tl=true (accessed November 25, 2024).

granted. By 2016, that phrase had acquired the meaning of referring to private parties. In 1990, the Supreme Court held that the phrase "manifests an intent to afford access to public records, *even when a private entity is responsible for the records." State ex rel. Mazzaro v. Ferguson,* 49 Ohio St.3d 37, 39 (1990) (emphasis added). That understanding was reiterated between 1990 and R.C. 2743.03(A)(3)(b)'s enactment. *State ex rel. Toledo Blade Co. v. Ohio Bur. of Workers' Comp.*, 2005-Ohio-3549, ¶ 20; *S/O ex rel. Am. Ctr. for Economic Equality v. Jackson*, 2015-Ohio-4981, ¶¶ 15-16 (8th Dist.). R.C. 1.42 therefore requires that R.C. 2743.03(A)(3)(b) be read as granting jurisdiction over claims against private respondents.

{¶17} Those textual directives are not overcome by Accel's argument that resolving claims against it through R.C. 2743.75's streamlined procedures would deprive it of due process by not allowing discovery under the Civil Rules. That argument does not persuade because the facts relevant to the claims against Accel should be well known to it without discovery. The only claims pressed here are based on the functional equivalence and quasi-agency doctrines. Those doctrines focus almost exclusively on the nature of the private entity and its interactions with a public office. The vast majority of the dispositive facts are therefore knowable to and provable by Accel without discovery. Although some of the relevant facts involve the Schools' finances, those facts can be easily understood and proven through publicly available audits and the information Accel can access because of its control over the Schools' finances. *Contracts*, §§ 2.1(d), (c), (f), (k); 4.2; 4.3; 4.6; 4.7; 4.8. Indeed, it is telling that Accel does not specify any topics it needs to explore through discovery.

### 2. Respondent's Civ.R. 12(B)(6) motion should be denied because it is based on materials beyond the complaint.

{¶18} A Civ. R. 12(B)(6) motion cannot be granted if the movant relies on matters beyond the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548 (1992). Accel's motion relies on such matters. It should therefore be denied.

## B. The court should grant portions requester's claim for production of records.

{¶19} Mr. Martin asserts two bases for requiring Accel to produce the records he seeks: that Accel is the functional equivalent of the Schools and that it is their quasi-agent. The evidence supports both bases, at least in part. Further, Accel's arguments to the contrary do not withstand scrutiny.

### 1. Accel is the functional equivalent of a public office.

{¶20} The courts consider multiple factors in determining whether a private entity is the functional equivalent of a public office, but the analysis is centered around four inquiries:

- Does the entity perform a governmental function?
- What level of public funding does the entity receive?
- What is the extent of government involvement in or regulation of the entity?
- Was the entity created by the government or to avoid the requirements of the Public Records Act?

*State ex rel. Oriana House, Inc. v. Montgomery,* 2006-Ohio-4854, ¶¶ 23, 25. An otherwise private entity can be a functional equivalent without all four factors suggesting that result, and no one inquiry is automatically dispositive. *State ex rel. Harm Reduction Ohio v. Oneohio Recovery Found*, 2023-Ohio-1547, ¶¶ 23, 32. Further, those four factors are not the only factors considered. The Supreme Court has recognized that the four factors are a "nonexhaustive list," and this court has considered factors beyond those four. *Oriana*, 2006-Ohio-4854, ¶ 22; *Sheil v. Horton*, 2018-Ohio-1720, ¶ 21, aff'd, 2018-Ohio-5240 (8th Dist.); *Schutte v. Gorman Heritage Farm Found*, 2019-Ohio-1611, ¶ 7, adopted 2019-Ohio-1818 (Ct. of Cl.), ¶ 7; *Geauga Cty. Prosecutor's Office v. Munson Fire Dept.*, 2023-Ohio-3958, ¶¶ 26-28 adopted 2023-Ohio-4437 (Ct. of Cl.). The functional equivalence test is used by courts construing the other states' public records laws, so precedents from those jurisdictions are relevant. *Oriana*, 2006-Ohio-4854, ¶¶ 21-22; *Munson Fire*, 2023-Ohio-3958, ¶¶ 15, 26.

{¶21} A functional equivalence analysis starts with a presumption that the private entity is not a functional equivalent. That presumption must be overcome with clear and convincing evidence. *Oriana,* 2006-Ohio-4854, ¶ 26.

### a. Accel performs a fundamental government function.

{¶22} Although no one factor is dispositive, the cases place great weight on whether the private entity performs a government function. *State ex rel. WTOL TV, L.L.C. v. Cedar Fair, L.P.,* 2023-Ohio-4593, ¶ 33, gave this factor decisive weight in a case when the other factors were evenly balanced because the public function was a "fundamental function[] of state government." This court has also placed significant weight on the essential nature of the public function. *Munson Fire*, 2023-Ohio-3958, ¶ 28. That is consistent with functional equivalence precedents from elsewhere; they hold that this factor is the "cornerstone" of, the "most critical[]," and of the "utmost importance" in functional equivalence analyses. *Memphis Publishing Co. v. Cherokee Children & Family Servs.*, 87 S.W.3d 67, 79; (Tenn.2002); *City Press Communs., LLC v. Tennessee Secondary School Ath. Assn.*, 447 S.W.3d 230, 235 (Tenn.App.2014).

{¶23} The function Accel performs is indisputably governmental. It manages the operations of two public schools. R.C. 2744.01(C)(2)(c) identifies public education as a governmental function, and the cases use that statute as a benchmark in this aspect of a functional equivalence analysis. *Hurt v. Liberty Twp.*, 2017-Ohio-7820, ¶ 38 (5th Dist.); *S/O ex rel. Am. Ctr. for Economic Equality v. Jackson*, 2015-Ohio-4981, ¶ 20 (8th Dist.); *Munson Fire*, 2023-Ohio-3958, ¶ 11, adopted 2023-Ohio-4437, ¶ 16. Out of state functional equivalence precedent recognizes that public education is a governmental function. *Marks v. McKenzie High School Fact-Finding Team*, 319 Ore. 451, 464 (1994) ("Unquestionably, the operation of a public school is a function traditionally associated with government"); *Tennessee Secondary School Ath. Assn.*, 447 S.W.3d at 238; *Bd. of Trustees of Woodstock Academy v. Freedom of Information Com.*, 181 Conn. 544, 554 (1980). Of particular interest here, our Supreme Court has noted, albeit in another context, that "the management company of a community school . . . performs[s] a traditional government function[.]" *Hope Academy*, 2015-Ohio-3716, ¶ 12.

{¶24} Further, education is a fundamental function of state government. The State's duty to provide public education arises from a constitutional mandate. Ohio Const., art. VI. The community school laws were enacted to fulfill that obligation. *Ohio Congress*, 2006-Ohio-5512, ¶¶ 23-34. This factor therefore strongly supports equivalence.

{¶25} That conclusion is not undermined by Accel's arguments to the contrary.

{¶26} Accel's assertion that it is not involved in the Schools' teaching function is rebutted by its contracts with the Schools. Under those contracts, Accel:

- Sets the Schools' curriculum, instructional design, and educational philosophy and is "solely responsible for implementing" those things. *Contracts*, § 2.1(h).

- Selects instructional materials. *Id.*, § 2.2.4(e).

- Evaluates pupils' performance. *Id.*, § 2.2.4(c).

- Provides special education. *Id.*, § 2.2.4(d).

- Decides how many teachers the Schools need. *Id.*, § 6.3.

- Hires, assigns, and provides professional development for teachers, including training them to become highly qualified teachers. *Id.*, §§ 2.1(l), 6.3.

Further, Accel's involvement in those matters is not that of a hands off consultant, it has "exclusive authority" over them. *Id.*, § 2.2.1.

{¶27} Accel's argument that acts taken to administer a charter school are not governmental does not persuade. Not only does Accel fail to provide any authority for this assertion, the cases demonstrate that administrative actions taken on behalf of charter schools are governmental acts under analogous standards. *Riester v. Riverside Community School*, 257 F.Supp.2d 968, 971-973 (S.D. Ohio 2002); *Matwijko v. Bd. of Trustees of Global Concepts Charter School*, 2006 U.S. Dist. LEXIS 103155 (W.D.N.Y, August 3, 2006).

### b. There is no evidence showing the percentage of Accel's funding that comes from government.

{¶28} "When considering the government-funding factor" the Supreme Court has "examined the percentage of the private entity's total revenues that come from public sources." *Harm Reduction*, 2023-Ohio-1547, ¶ 22. There is no evidence on this point. It therefore cuts against functional equivalence.

### c. Government involvement or regulation.

{¶29} This factor is phrased in the disjunctive; it considers "the extent of government involvement *or* regulation[.]" *Oriana*, 2006-Ohio-4854, paragraph two of the syllabus (emphasis added). It can therefore be satisfied with proof of *either* a high degree of involvement with government *or* a high degree of regulation by government. *Sheil*, 2018-Ohio-5240, ¶¶ 32-35; *Munson Fire*, 2023-Ohio-3958, ¶ 17. Both are present here.

### i. Accel is intimately involved with the daily operation of two public schools.

{¶30} An entity is likely to be the functional equivalent of a public office if it is "closely intertwined" with a government body. That is true even if the entity's day-to-day operations are not controlled by government. *Sheil*, 2018-Ohio-5240, ¶ 35; *Schutte*, 2019-Ohio-1611, ¶ 17; *Munson Fire*, 2023-Ohio-3958, ¶ 17. Several groups of facts establish that Accel is closely intertwined with the Schools, which are public offices.

{¶31} Operationally, Accel is involved in every aspect of the Schools' activities. As shown in its contracts, Accel controls *every* aspect of the Schools' day-to-day operations. Accel:

- Sets and implements the Schools' educational programs, including the selection and acquisition of instructional materials, equipment and supplies, and the administration of extra-curricular and co-curricular activities. *Contracts*, §§ 2.1(h), 2.2.4(d), (e).

- Sets the Schools' operating procedures. *Id*., § 2.2.4(a)

- Disciplines students. *Id*., § 2.2.4(a).

- Sets the Schools' staffing levels. *Id*., § 2.2.4(f); 6.1; 6.2; 6.4.

- Hires, fires, assigns, and trains the Schools' line employees and handles the Schools' human resources matters. *Id*., §§ 2.1(a), (b), (e), (l); 2.2.4(f); 6.1, 6.3, 6.2, 6.5.

- Provides the Schools' executive leadership. *Id*., §§ 2.1(g); 6.2.

- Finds and maintains the Schools' facilities. *Id*., § 2.1(c); 2.2.4(g).

- Is responsible for all aspects of the Schools' food service operations. *Id.*, § 2.1(j).

- Controls the Schools' funds. *Id.*, § 2.1(d); 4.2; 6.1.

- Purchases all goods and services necessary for the orderly operation of the Schools. *Id.* § 2.1(m).

- Handles the Schools' technology. *Id.* § 2.1(r)

- Represents the Schools in their interactions with grantors, the Department of Education, and Auditor of State. *Id.*, § 2.1 (f), (j), (k); 4.8.

{¶32} In short, Accel is granularly involved in every aspect of the Schools' operations. Similar to *Munson Fire*, the private entity and public bodies "are operationally intertwined in multiple ways[.]" 2023-Ohio-3958, ¶ 19. Indeed, Accel's involvement is far more pervasive than that found to support equivalence in *Munson Fire*.

{¶33} Financially, Accel and the Schools are joined at the hip. The Schools fund the expenditures Accel must make pursuant to its contracts with the Schools, so Accel could not sustain its operations on their behalf without that support. *Contracts*, § 4.3.5; 6.1; *OCP Audit* p. 41, notes. 13, 14 *NEO Audit*, pp. 41-42, note. 13. Indeed, the essential nature of the Schools' funding is evidenced by the fact that Accel has expressly declined to make those purchases from its own funds and that the lack of funding from the Schools is grounds for terminating its relationship with them. *Contracts*, §§ 2.2.2; 3.2. Similarly, the Schools could not operate without the things purchased by those expenditures; Accel purchases "*all* goods and services *necessary* for the orderly operation of the School[s]." *Id.*, § 2.1(m) (Emphasis added); *OCP Audit* p. 41, notes. 13, 14; *NEO Audit*, pp. 41-42, note. 13. That mutual dependence also supports the existence of an intertwined relationship. *Munson Fire*, 2023-Ohio-3958, ¶¶ 19, 21.

{¶34} Legally, Accel and the schools are in a fiduciary relationship. "A management company that undertakes the daily operation of a community school has a fiduciary relationship with the community school that it operates." *Hope Academy*, 2015-Ohio-3716, paragraph two of the syllabus. Accel therefore owes strong fiduciary duties to the

Schools. See *Renaissance Academy for Math & Science of Missouri, Inc. v. Imagine Schools, Inc.*, 2014 U.S. Dist. LEXIS 174728 (W.D. Mo., December 18, 2014), \*\*11-14, 25 (describing the duties). As this court has held, a fiduciary relationship is "an inherently close relationship" that supports functional equivalence. *Munson Fire*, 2023-Ohio-3958, ¶ 18.

{¶35} Publicly, Accel represents itself as being one with the schools themselves. Its website presents the Schools as being its own, speaking of them in terms of "we" and "our[s]."[7] That too shows the type of intertwinement supporting functional equivalence. *Sheil*, 2018-Ohio-1720, ¶ 12, *aff'd*, 2018-Ohio-5240, ¶¶ 33, 35; *Munson Fire*, 2023-Ohio-3958, ¶ 20.

### ii. Accel's actions on behalf of the Schools are extensively regulated by government.

{¶36} An entity that manages all aspects of a community school's operations "stand[s] in the shoes of" the school. 1 *Anderson's Ohio School Law Guide* § 2.35.1. It is therefore appropriate to consider regulation of a school as regulation of its management company.

{¶37} Although community schools are exempted from some of the more "picayune" laws governing other public schools, they are expected to comply with most of the state and federal laws governing school districts. *Ohio Congress*, 2006-Ohio-5512, ¶¶ 30, 33, 110-175. Those laws are extensive, including, among other things, proficiency/achievement standards/testing, teacher licensure requirements, special education standards/procedures, student privacy laws, verifications of hours of instruction provided. 1 *Anderson's Ohio School Law Guide* § 2.27; *Baldwin's Ohio School Law*, § 48:7; *Electronic Classroom of Tomorrow*, 2018-Ohio-3126. The seminal case of the functional equivalence test found much less comprehensive regulation of a private educational entity sufficient to support equivalence. *Woodstock Academy*, 181 Conn. at 554 (finding that the fact that the private entity had "its operations examined and certified

---

[7] Accel Schools, *Our Schools*, https://accelschools.com/our-schools/ (accessed November 25, 2024).

by the state board of education so as to be eligible for reimbursement for tuition fees" supported functional equivalence).

### iii. *Oriana* and *Nova* do not undermine this aspect of equivalence.

{¶38} Accel relies on *Oriana* and *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 2006-Ohio-6713, to argue that this factor does not support equivalence, but those cases cannot bear the weight Accel places on them. That is true in two respects.

{¶39} *First, neither case considered the "government involvement" aspect of this factor, but instead considered only the "regulation" alternative of this disjunctive test.* *Oriana*'s disjunctive language and the Eighth District's decision in *Sheil* establish that significant involvement with government is sufficient to support equivalence—even if government does not regulate the private entity's day-to-day activities, 2018-Ohio-5240, ¶¶ 31-35. Accel is significantly involved in the Schools' operations, and they are government bodies. That supports this factor, independent of the government regulation prong of this factor.

{¶40} To the extent that *Oriana* and *Nova* are relevant to this prong of this disjunctive factor, they *support* equivalence. They focused on the "day-to day" interaction of private entities and government bodies. Accel's involvement with the Schools is day-to-day involvement to the nth degree—Accel's total control over the Schools means that it is involved all day, every day, in every aspect of their operations.

{¶41} Second, *Oriana* and *Nova* are factually distinguishable regarding the "regulation" alternative because, unlike the entities considered there, Accel is subject to extensive regulation. As previously discussed, Accel "stand[s] in the shoes of" the Schools and is their "de facto persona." 1 *Anderson's Ohio School Law Guide* § 2.35.1; *Hope Academy*, 2015-Ohio-3716, ¶ 44. As such, its operation of the Schools are subject to extensive substantive regulation. That regulation is far more pervasive than that in *Oriana* and *Nova Health*. Further, it is more complete than the regulation found sufficient to support equivalence in *Cedar Fair*, 2023-Ohio-4593, ¶ 31.

### d. Creation.

{¶42} This factor considers whether the private entity "was created by the government or to avoid the requirements of the Public Records Act." *Oriana*, 2006-Ohio-

4854, paragraph two of the syllabus. There is no evidence that either of these things are true of Accel. This factor cuts against functional equivalence.

### e. Other factors.

{¶43} The Supreme Court has recognized that the four factors discussed above are "nonexhaustive[.]" *Oriana*, 2006-Ohio-4854, ¶ 22. Consistent with that, this court has considered factors beyond those four. *Sheil*, 2018-Ohio-1720, ¶ 21; *Schutte*, 2019-Ohio-1611, ¶ 7; *Munson Fire*, 2023-Ohio-3958, ¶¶ 26-28. Four additional factors support functional equivalence.

{¶44} *The first is the large amount of public money involved*. This factor is different from the second factor discussed above in that it does not focus on the public funding's impact on the private entity's finances, but instead considers the private entity's impact upon the public body's finances. Functional equivalence is supported by large outflows of public money from the public office because the public has an interest in monitoring how its money is spent. *Munson Fire*, 2023-Ohio-3958, ¶ 28.

{¶45} Very large amounts of public money flow from the Schools to Accel. Their most recent state audits reported that during the fiscal year ending June 30, 2023, the Schools transferred $7,104,733 to Accel. *OCP Audit*, p. 41, notes. 13, 14; *NEO Audit*, pp. 41-42, note. 13. All that money is public money. *Sun Bldg. Ltd. Partnership v. Value Learning & Teaching Academy*, Hamilton C.P. No. A1404504, 2018 Ohio Misc. LEXIS 2, ¶ 22 (Mar. 26, 2018). Further, that is only the amount transferred in *one year* of the Schools' *10 year* contracts with Accel, so it represents only a small portion of the public funds flowing from the Schools. The public has a strong interest in understanding how that large amount of public money is spent. That supports equivalence.

{¶46} *The second is that Accel exercises governmental authority to make decisions binding third parties.* The functional equivalence test was derived in part from cases considering whether the federal Freedom of Information Act ("FOIA") applied to private entities. *Oriana*, 2006-Ohio-4854, ¶¶ 21, 25; *Woodstock Academy*, 181 Conn. at 553-555. Those cases placed significant weight on whether the private entities were empowered to exercise governmental authority to make decisions binding third parties. FOIA was applied if they were, but was not if they were not. *Grumman Aircraft Eng. Corp.*

*v. Renegotiation Bd*., 482 F.2d 710, 715 (D.C. Cir. 1973); *Washington Research Project, Inc. v. Dept. of Health, Edn. & Welfare*, 504 F.2d 238, 247-248 (D.C. Cir.1974); *Ciba-Geigy Corp. v. Mathews*, 428 F.Supp. 523, 527-528 (S.D.N.Y.1977); *Ry. Labor Executives' Assoc. v. Consol. Rail Corp*., 580 F.Supp. 777, 779 (D. D.C. 1984). Other states applying the functional equivalence test likewise consider the private entity's ability to make decisions binding on third parties. *Meri-Weather, Inc. v. Freedom of Information Comm*., 47 Conn. Supp. 113, 120 (2000), *aff'd & opinion adopted*, 63 Conn. App. 695 (2001) ("Courts have held that entities that are the functional equivalent of a public agency have the power to govern or to regulate or to make decisions"); *Marks*, 319 Ore. at 464-465, 466. See also *News & Observer Pub. Co. v. Wake Cty. Hosp. Sys., Inc*., 55 N.C. App. 1, 8-9 (1981).

{¶47} Accel has that authority. It can hire, fire, assign, and discipline the Schools' employees. It can discipline students. It determines the nature of the special education students receive. It can regulate parents' actions with regard to the school. *Contracts*, §§ 2.1(a), b); 2.2.4(a), (d), (f); 6.1; 6.2; 6.3. Each of those actions would be the exercise of governmental authority if taken by a traditional public school. There is no apparent reason why they are not the exercise of governmental authority here. Further, Accel's decisions are final because the Schools have given Accel "exclusive authority" over those matters and have reserved only the right to provide informational input. *Id*., §§ 2.2.1; 2.2.5. Accel's decisions on those matters therefore bind third parties (employees, students, parents). This too supports functional equivalence.

{¶48} *The third is that the functions Accel performs would have been performed by the Schools' absent their contracts with Accel*. The Supreme Court noted in *Nova* that functional equivalence is more likely when the private entity performs tasks that would otherwise be within the scope of a public body's responsibilities. 2006-Ohio-6713,¶ 28. It relied on that dynamic to support a finding of equivalence in *Harm Reduction*, 2023-Ohio-1547, ¶¶ 33, 34.

{¶49} The functions Accel performs would unquestionably be performed by the Schools absent their contracts with Accel. The Schools are public schools and the functions Accel performs for them are the nuts and bolts, the blocking and tackling, of

running a public school. Those tasks would necessarily be performed by the Schools absent their delegation to Accel. That supports functional equivalence.

{¶50} *The fourth is the complete nature of delegation the Schools made to Accel*. As this court has noted, "equivalence is supported by the complete transfer of the government function involved . . . equivalence is more likely when a public body makes a wholesale delegation of its duties to a private entity." *Munson Fire*, 2023-Ohio-3958, ¶ 26. That is because a "finding against equivalence would frustrate" the purpose of the Public Records Act by "effectively placing the [delegating office's] operations . . . in a black box." *Id*. at ¶ 28. Courts performing the functional equivalence analyses in other states likewise find that sweeping delegations support equivalence. *Mem. Hosp.-West Volusia v. News-Journal Corp*., 729 So.2d 373, 381 (Fla.1999); *Memphis Publishing*, 87 S.W.3d at 78-79.

{¶51} The Schools have made a complete delegation of their functions to Accel. Accel performs *every* aspect of the Schools' operations. All the schools have retained is a limited ability to negotiate their annual budgets; they have ceded all other functions and all other discretion to Accel. This too supports equivalence.

### f.  Weighing the factors.

{¶52} The balance of the factors tips towards equivalence. Of the six factors applicable here, four support equivalence (governmental function, involvement with/regulation by government, amount of public money involved, exercise of governmental authority, the otherwise public nature of the work performed, the complete nature of the delegation). Further, those factors do so strongly; they do not present close questions. In contrast, only two factors weigh against equivalence (proportion of the private entity's public funding, the circumstances of the entity's creation). Other cases have found equivalence despite those factors cutting against it. *Harm Reduction*, 2023-Ohio-1547, ¶ 23 (percentage of private entity's public funding); *Cedar Fair,* 2023-Ohio-4593, ¶¶ 30, 32 (percentage of private entity's public funding, circumstances of creation); *Munson Fire*, 2023-Ohio-3958, ¶ 23 (circumstances of creation). I therefore recommend that the court find that Accel is the functional equivalent of the Schools.

{¶53} I do not, however, recommend that the court find that Accel is the functional equivalent of any other school. Functional equivalence must be supported by clear and convincing evidence. *Oriana,* 2006-Ohio-4854, ¶ 26. Although that evidence is present regarding the Schools, no evidence is present regarding Accel's relationship to any other school. Any order requiring the production of records based on functional equivalence should therefore be limited to records related to the Schools.

### 2. The quasi-agency doctrine also requires Accel to produce some of the records requested.

{¶54} The quasi-agency doctrine allows access to records in a private party's possession that are related to a delegated public function. *State ex rel. Armatas v. Plain Twp. Bd. of Trustees*, 2021-Ohio-1176, ¶¶ 16-18; *State ex rel. Ames v. Baker, Dublikar, Beck, Wiley & Mathews*, 2022-Ohio-3990, ¶¶ 6-14. It is based on the settled principle that public "entities cannot conceal public records by delegating a public duty to a private entity." *State ex rel. Findlay Publishing Co. v. Hancock Cty. Bd. of Commrs.*, 80 Ohio St.3d 134, 137 (1997). The quasi-agency doctrine applies even if the private entity is not the functional equivalent of a public office. *Armatas*, 2021-Ohio-1176, ¶ 15, n. 3. A requester is entitled to records under this test if the evidence establishes that the records sought are related to a delegated governmental function. *Id*. at ¶ 16.

{¶55} The evidence here establishes that records related to the persons specifically named in Mr. Martin's request are related to a delegated public function. Mr. Martin seeks several types of personnel records related to several named persons who served the Schools. As discussed in connection with functional equivalence, running a public school is a governmental function, and the various specific tasks involved in doing so are normally performed by the school, a public office. Hiring managerial staff is a governmental function that supports the application of the quasi-agency doctrine if a public office delegates that function to a private entity. *State ex rel. Gannett Satellite Information Network v. Shirey*, 78 Ohio St.3d 400, 403 (1997); *State ex rel. Plain Dealer Publishing Co. v. City of Cleveland*, 75 Ohio St.3d 31, 35 (1996). Documents related to human resources matters are generally public records. Ohio Attorney General, *Ohio*

*Sunshine Laws 2024, An Open Government Resource Manual*, p. 75.[8] The Schools are public offices, and they have delegated their hiring and other human resources functions to Accel. *Contracts*, §§ 2.1(a), (b), (g), (e); 2.2.4(f); Art. VI. The records sought in paragraphs 1, 2, 4, and 5 of Mr. Martin's request are all related to that function: hiring managerial staff for the Schools and related human resources matters. Further, the *In Camera Docs.* show that all the persons Mr. Martin specifically identified were hired to perform services for one or both of the Schools:

| Named Individual | Position | *In Camera Doc.* pp. |
|---|---|---|
| Deborah Mays | Superintendent | 1612-1613 |
| Jennifer Turski | Director of Academics, | 1100, 1113, 1119, 1126, 1134, 1295 |
| Nova O'Callaghan | Principal | 1760, 1767, 1778 |
| Arnetta Crook | Director of Academics | 315, 322, 330 |
| Veda-Giles Weeks | Principal, Director of Student Services | 2001, 2325, 2339 |
| Emma Simpson | Family and Community Liaison | 818, 824, 834, |
| Ivy Dodd | Associate Principal, Director of Academics, Family & Community Liaison | 968, 1045, 1053, 1067, 1075 |
| Miysha Godfrey | Dean of Students, Office Manager | 1667, 1694 |
| Horold Booker | Dean of Students | 900, 907 |
| Darryl Owens | Dean of Students | 745 |
| Lavar Martin | Assistant Dean | 193, 197, 204, 243, 249, 256 |
| Temika Whitsett | Director of Academics, Director of Professional Learning | 1871, 1921, |
| Jeremiah Latimore | Dean of Student | 1304 |
| Barry Yancy | Dean of Students, Basketball Coach | 336, 354, 363, 369, 376 |

The records regarding those persons are therefore accessible via the quasi-agency doctrine.

---

[8]https://www.ohioattorneygeneral.gov/Files/Publications-Files/Publications-for-Legal/Sunshine-Laws-Publications/2024-Sunshine-Manual (accessed November 25, 2024)

{¶56} The evidence does not, however, establish that the doctrine applies to records regarding the unnamed administrators referenced in Mr. Martin's request. There must be evidence proving facts making the quasi-agency doctrine applicable. *Armatas*, 2021-Ohio-1176, ¶¶ 16, 18; *Ames*, 2022-Ohio-3990, ¶ 7. There is no evidence that the unnamed administrators performed any function delegated from the Schools or any other public office, so the doctrine cannot be applied to records concerning them.

{¶57} Those conclusions are not undermined by Accel's arguments against applying the quasi-agency doctrine. Each of those arguments are rebutted by controlling precedent.

{¶58} Accel's argument that the materials sought were not public records because they were not created or received by the Schools overlooks *Armatas* and *Ames*. Those cases held that a document is a record if it is "under the jurisdiction" of a public office, even if it was not created or received by the office. They further held that a document generated in connection with the delegated performance of an office's public functions is under the office's jurisdiction and hence is a public record. *Armatas,* 2021-Ohio-1176, ¶¶ 14, 22, 23; *Ames*, 2022-Ohio-3990, ¶ 8. See also, *Ferrise v. Berea City School Dist*., 2024-Ohio-5310, ¶¶ 9-11, 16 (Ct. of Cl.). Here, the Schools were required to find administrators to oversee their operations and delegated that function to Accel. The materials sought are related to Accel performing that function. Those materials are therefore under the School's jurisdiction, and hence public records, even if the Schools did not create or receive those records.

{¶59} Accel's argument that the materials need not be produced because they are owned by it, rather than the Schools, overlooks *State ex rel. Mazzaro v. Ferguson*, 49 Ohio St.3d 37 (1990). It held that "[r]ecords *owned or possessed by private entities* . . . are subject to statutory disclosure requirements . . . R.C. 149.43(B) requires the disclosure of public records and *applies despite any ownership interest*." *Id*. at 40 (Emphasis added).

{¶60} Accel's argument that the quasi-agency doctrine must be invoked against the public office, rather than the private delegee, overlooks *Ames* and the case law it summarized. *Ames* rejected the same argument because the cases had "extended the

quasi-agency test to private entities, requiring them to produce public records" and because "the Public Records Act authorizes a mandamus action against *either* 'a public office *or* the person responsible for the public record,' R.C. 149.43(C)(1)(b)." 2022-Ohio-3990, ¶ 10 (Emphasis added). *State ex rel. Brown v. Columbiana Cty. Jail*, 2024-Ohio-4969, is not to the contrary. Although *Brown* upheld bringing a quasi-agency claim against the office rather than its delegee, it did not require that approach.

{¶61} Accel's arguments about the various subparts of the quasi-agency other than the delegation of a public function overlooks *Armatas*. That case held that those subparts are immaterial if the requester shows that the materials sought are related to a delegated public function. 2021-Ohio-1176, ¶¶ 16-18. That has been shown here, making those subparts irrelevant.

### 3. Accel's other arguments against production are flawed.

{¶62} Accel makes two other arguments against production of records, but neither is valid.

{¶63} Accel has waived its arguments that Mr. Martin's request was ambiguous and overbroad. A respondent "that does not timely deny a request as ambiguous or overly broad and provide the requester with the opportunity to cure that defect has waived the defense of overbreadth in subsequent enforcement litigation." *Hunt Eng., LLC v. Ohio EPA,* 2022-Ohio-3141, ¶ 11, adopted 2022-Ohio-3557 (Ct. of Cl.); *Schaffer v. Ohio State Univ.*, 2024-Ohio-2185, ¶ 46, adopted 2024-Ohio-2625 (Ct. of Cl.); R.C. 149.43(B)(2). Accel did not raise ambiguity or overbreadth in its responses to Mr. Martin's requests. *Complaint*, pp. 7-9. It has therefore waived those defenses.

{¶64} Accel's assertion that it is excused from producing records containing information exempted from the Public Record Act overlooks the text of R.C. 149.43(B)(1). It does not authorize the wholesale withholding of a record because it contains some exempt information. It instead requires that if "a public record contains information that is exempt … the public office or the person responsible for the public record *shall make available all of the information within the public record that is not exempt*." (Emphasis

added). The fact that some of the records responsive to Mr. Martin's request contain exempted information therefore provides no basis for withholding those records.

### 4. Paragraph 3 of requester's request is unenforceable.

{¶65} R.C. 149.43(B)(1) codifies a right to records that capture information, but not to information apart from records. It nowhere mentions information in the abstract. It instead provides that upon "request . . . *public records* responsive to the request shall be . . . made available[.]" (emphasis added). A "public record" consists of a "record," and a "record" is something that contains information, but is different than the information itself. It is a "document, device, or item" recording information. R.C. 149.011(G). R.C. 149.43(B)(1) therefore does not direct offices to provide free floating information, but only documents, devices, or items containing information. The cases reflect the distinction. Relief is denied when the claimant has "requested information rather than records" *State ex rel. Griffin v. Sehlmeyer*, 2022-Ohio-2189, ¶ 1, because requests "for information \*\*\* are improper requests under R.C. 149.43*." State ex rel. Morgan v. City of New Lexington*, 2006-Ohio-6365, ¶ 30. See also *Griffin*, 2022-Ohio-2189, ¶¶ 10-13; *State ex rel. Griffin v. Sehlmeyer*, 2021-Ohio-1419, ¶¶ 11-12; *State ex rel. Griffin v. Sehlmeyer*, 2021-Ohio-3624, ¶¶ 5-6.

{¶66} The third paragraph of Mr. Martin's request seeks information about Accel's funding, apart from records. It is therefore unenforceable.

### 5. The court should deny requester's motion to compel.

{¶67} The court should deny Mr. Martin's October 24, 2024, *Motion to Compel* for because he failed to provide proof that the motion was served. Civ. R. 5(B)(4) therefore prohibits any relief based on that motion.

### 6. Summary of recommendation regarding production of records.

{¶68} The scope of the productions I recommend vary depending upon the legal bases for applying the Public Records Act to Accel.

{¶69} If the court holds that Accel is the functional equivalent of the Schools, Accel should be ordered to produce all records responsive to paragraphs 1, 2, 4, and 5 of Mr.

Martin's request that pertain to either of the Schools, regardless of whether they pertain to the individuals named in paragraph 1 of that request. Accel should not be required to produce, in this case, records related to other schools. Accel should not be ordered produce the information sought in paragraph 3 of Mr. Martin's request. All records produced should be redacted to protect third parties' statutory privacy rights.

{¶70} If the court does not conclude that Accel is the functional equivalent of the Schools, but does find that the quasi-agency doctrine applies, Accel should be ordered to produce all records responsive to paragraphs 1, 2, 4, and 5 of Mr. Martin's request that pertain to the individuals named in paragraph 1 of that request. Accel should not be ordered to produce records related to the unnamed administrators mentioned in Mr. Martin's request. Nor should Accel be required to respond to the requests for information made in paragraph 3 of Mr. Martin's request. All records produced should be redacted to protect third parties' statutory privacy rights.

### C. Requester is entitled to recover his filing fee and costs; respondent should bear the balance of the costs.

{¶71} R.C. 2743.75(F)(3)(b) provides that the "aggrieved person shall be entitled to recover from the public office *** the amount of the filing fee *** and any other costs associated with the action[.]" Mr. Martin was aggrieved by the Accel withholding records he was entitled to. I therefore recommend that he recover his filing fee and the costs he incurred in this case. I also recommend that Accel bear the balance of the costs of this case.

## III. Conclusion.

{¶72} In light of the foregoing, I recommend that:

A. If the court accepts the proposition that Accel is the functional equivalent of the Schools, Accel be ordered to produce all records responsive to paragraphs 1, 2, 4, and 5 of Mr. Martin's request that pertain to either of the Schools, regardless of whether they pertain to the individuals named in paragraph 1 of that request. All records produced should be redacted to protect third parties' statutory privacy rights.

B.  If the court does not conclude that Accel is the functional equivalent of the Schools, but does find that the quasi-agency doctrine applies, Accel be ordered to produce all records responsive to paragraphs 1, 2, 4, and 5 of Mr. Martin's request that pertain to the individuals named in paragraph 1 of that request. All records produced should be redacted to protect third parties' statutory privacy rights.

C.  The court order that Mr. Martin recover from Accel his filing fee and the other costs he incurred in connection with this case and that Accel bear the balance of the costs of this case.

D.  That the court deny all other relief.

{¶73} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state with particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*

TODD MARTI
Special Master

**Filed November 25, 2024**
**Sent to S.C. Reporter 12/20/24**